IN THE

# SUPREME COURT

OF

# OREGON.

Argued May 22, affirmed July 3, 1917.

## HUBBARD v. SCOTT.*

(166 Pac. 33.)

**Libel and Slander—Disparagement of Property of Another—Slandering Business.**

1. Language which does no more than to disparage the property of another or the quality of the articles which he manufactures or sells is not actionable unless special damages are alleged and proved; but, if the language disparaging the property of another also involves an imputation upon him in respect to his trade, business, or profession, then the language becomes actionable *per se*, and it is unnecessary to allege or prove special damages.

**Libel and Slander—Slander of Business.**

2. Words to be actionable as slandering a person's business must touch the person in his business, and must impeach either his skill or knowledge, or attack his conduct therein.

**Libel and Slander—Slander of Business—Sale of Land.**

3. Assuming that plaintiff's attempt to sell a tract of land was a business, a statement of another that they had no right to sell it was not actionable as a slander of such business, because the statement did not impute dishonesty or deceitfulness, or that they lacked capacity or skill, or that they were violating any law in pursuit of the alleged business.

[As to disparagement of property or of manufactured articles as libel or slander, see note in Ann. Cas. 1914D, 1151.]

---

*For a discussion of the question of disparaging quality of goods sold or manufactured as libel or slander, see note in 48 L. R. A. (N. S.) 1214.

For authority passing on the question of necessity of proving special damages in an action for slander of title, see note in 13 L. R. A. 707. REPORTER.

**Libel and Slander—Slander of Title—Option Holders.**

4. Option holders, although not owning the land, have such an interest as entitles them to damages from any person slandering their title.

**Libel and Slander—Slander of Title—Option Holders.**

5. If the owner of land falsely and maliciously stated that his contract of option to plaintiffs had expired and that they had no rights thereunder and no right to engage in selling and disposing of the land, he was guilty of slandering plaintiff's title.

**Libel and Slander—Slander of Title—Special Damages.**

6. Plaintiff in action for damages for slander of title must allege and prove special damages, and it is not enough merely to allege generally that he intended to sell to any person who might buy, but he must allege and prove the loss of sale to some particular person; the loss of sale to some particular person being the special damage and the gist of the action.

**Libel and Slander—Slander of Title—Damages.**

7. In action by option holders against the owner giving the option for slander of their option title by a statement that the option had terminated, plaintiffs could not recover expense of attorney's fees in defense of a prior suit by the owner to forfeit the option; for, although the fees fixed by statute and technically known as costs did not furnish full compensation, the decree awarded in the prior suit is supposed to have adjudged to the prevailing parties all sums to which they were entitled for expenses therein incurred.

From Jackson: GEORGE F. SKIPWORTH, Judge.

Department 1.   Statement by MR. JUSTICE HARRIS.

This is an action for damages. William Scott and A. B. Saling signed a writing for the sale of 1,365 acres of land owned by Scott. For the sake of convenience the writing will be designated as an option. It is dated December 31, 1908, and, so far as it is material here, reads thus:

"I, William Scott * * in consideration of fifty dollars paid monthly in advance to me in hand paid by A. B. Saling, do hereby agree to sell and convey to said A. B. Saling, or unto his heirs, assigns and legal representatives, the following described property. (Describing it.)

"It is expressly understood and agreed that the said William Scott reserves all coal, oil or gas, also minerals and stone of whatever kind in and under

above described lands, with the right to go on the premises and explore and mine for same not nearer than 300 feet from any building, and this option will be effective as long as A. B. Saling continues to pay William Scott the sum of $50.00 per month in advance, and not longer; provided, however, this option shall terminate and all sums paid hereunder be forfeited absolutely unless the same is exercised before five years from this date. No part of the $50.00 monthly payments shall be applied on the purchase price of the land.

"It is also agreed that any improvements put upon the land at any time since December 1st, 1908, or at any time hereafter, including care of fruit trees, are to be added to the purchase price and that time is of the essence of this agreement, terms as follows: $10,000 cash and balance in three equal annual payments at six per cent interest per annum, upon the payment of said sum of $50.00 per month in advance, to be paid at said times, and in the manner above set forth, and if not paid as herein set forth, then this option shall be void."

Saling sold his interest in the option on September 16, 1909, and was succeeded by the plaintiffs L. P. Hubbard, Mabel Zimmer, and Mendon Schutt. The plaintiffs made the monthly $50 payments by depositing the money in a bank for Scott until October 18, 1910, when Scott notified the bank not to accept any further payments for the reason that he claimed that the moneys should be paid to him in person at his residence. On the last day of October, 1910, the plaintiffs paid $50 to Scott for the ensuing month of November and, on the last day of November, they made the payment for the month of December. On the last day of December, 1910, Scott refused to accept any money for the ensuing month and the plaintiffs then deposited the money in the bank for Scott. Not being able to find Scott on the last day of January or on the last day of February, 1911, the plain-

tiffs deposited the installments in the bank for the use of Scott. These three payments were withdrawn from the bank by Scott in March, 1911. The defendant accepted payments for the months of April and May, 1911, but when he refused to receive payments for the months of June, July and August, 1911, the plaintiffs left the moneys in the bank for him. On August 2, 1911, Scott began a suit against Hubbard, Zimmer and Schutt, plaintiffs here, to cancel the option. In September, 1912, the Circuit Court rendered a decree against Scott and on December 23, 1912, he appealed to the Supreme Court where the decree was affirmed on December 19, 1913. When these plaintiffs filed their answer to the suit prosecuted by Scott, they withdrew from the bank the moneys that they had left there for the June, July and August, 1911, payments, and deposited the same moneys with the clerk of the Circuit Court for the use of Scott. All subsequent installments to and including August 31, 1912, were paid to the clerk of the Circuit Court, but the payments after that date up to and including November 30, 1913, were tendered to Scott and upon his refusal to accept the moneys they were paid to the bank for his use. The moneys left with the bank, aggregating $750, were subsequently paid to Scott and he also received the moneys paid to the clerk of the Circuit Court amounting to $800.

When Saling signed the option he was without money and was unable to purchase the land on his own account, but he entered into the contract with the intention of engaging

"in the business of attempting to secure a customer or customers for said land at such price or prices as he should be able over and above said option price, and that at any time during the life of said option contract any such sum above said option price that he should be

able to secure for said land should constitute his profit and earnings in said business.''

The complaint avers that the plaintiffs did not have sufficient means to purchase the land but that they acquired Saling's rights with the intention

''of handling and selling said premises and of realizing as their profit and earnings in such business such price as they might secure from a purchaser over and above the contract price named in said option agreement. All of which was at all times well known to the defendant.''

The plaintiffs claim that they were unable to sell the land on account of various acts which were deliberately and designedly committed by Scott. For the purpose of ascribing a motive for Scott's conduct, the complaint charges that at the time the option was signed the land was really worth less than the price agreed upon, but by reason of an increase in the market price of real estate in that vicinity the Scott land increased in value and from June 1, 1910, to May 1, 1913, its reasonable value, subject to the reservations in the option, exceeded the contract price by more than $10,000. The acts of which the plaintiffs complain may be placed in four different chapters, covering four periods of time ending December 31, 1910, in March, 1911, May 31, 1911, and December 31, 1913.

It will be recalled that until October, 1910, all the monthly payments were made at the bank, but that Scott then demanded that payments should be made to him personally at his residence. The plaintiffs alleged that in addition to requiring that the advance payments be made to him in person, the defendant insisted that such payments be made on the last day of the month, and that this requirement was made for the

purpose of causing plaintiffs so much inconvenience
that they might possibly fail to make some monthly
payment and by such failure terminate the lease.
The plaintiffs say that, in order to avoid loss and in-
jury, they yielded to the demands made by Scott and
after October, 1910, they tendered or made all the
payments to him personally, except on certain oc-
casions when they were unable to find Scott because,
as they say, he had absented himself from his resi-
dence in furtherance of his plan to hinder the plain-
tiffs. On December 31, 1910, Scott refused to ac-
cept $50 tendered to him for the month of January,
1911, claiming that under the terms of the option the
initial payment of $10,000 was due on the purchase
price.

The plaintiffs construed the option differently and
contended that the first payment on the purchase
price could be paid at any time within five years from
the date of the option; and, in order to prevent the
option from lapsing, the plaintiffs left the monthly
installments at a bank until March, 1911, when Scott
accepted the moneys left at the bank. The plaintiffs
claim that this acceptance operated as an acknowl-
edgment by Scott that his construction of the option
was wrong, while he explains the acceptance by say-
ing that the plaintiffs had experienced difficulty in
selling the land on account of the mineral reserva-
tion in the option, and, for the purpose of removing
that difficulty, they orally agreed in March, 1911, to
add $10 per acre to the price of the land, and upon
reaching such an agreement he accepted the moneys
left at the bank for the January, February and March,
1911, installments.

The payments for the months of April and May
were made to Scott but the payment for June, which

was due in May, was not made in May. The plaintiffs explain their failure to pay in May by saying that on May 25, 1911, Scott orally proposed to amend the written option so as to make it read thus:

"That the plaintiffs should advance to the defendant $600 on account of the sums which would become due upon the monthly payments under said contract unless the plaintiffs should sooner exercise said option to purchase, and that in that event any part of said $600.00 should apply on the purchase price of said premises."

The plaintiffs aver that they accepted the offer to amend the option; and, having been led to believe that it would be satisfactory to Scott if the money was paid within a week or ten days, they did not tender the $600 until June 1, 1911. The defendant refused to accept the $600, when tendered on June 1, and then on the same day the plaintiffs tendered $50 as the monthly payment for June, but Scott claimed that the option had lapsed because the payment for June had not been made in May and he refused to accept the proffer.

The suit which Scott began in August 1911, was predicated on the theory that the option had lapsed on account of the failure to pay the June installment before the last day of May, but the Circuit Court found that the payment was not made for the reasons assigned by Hubbard, Zimmer and Schutt and held that Scott was not entitled to have the option canceled; and an appeal confirmed the view taken by the Circuit Court: *Scott* v. *Hubbard,* 67 Or. 498, (136 Pac. 653). The moneys which until August 31, 1912, were paid to the clerk of the Circuit Court and the installments paid to the bank subsequent to that date were accepted by Scott after the decision of the suit on the appeal.

The complaint charges that after December 31, 1910, when Scott claimed that the option had lapsed, he

"wrongfully stated to divers and sundry persons that said contract had expired and was void and that the plaintiffs had no rights thereunder and had no right to engage in the business of selling and disposing of said land whereby these plaintiffs were unable to successfully prosecute said business."

Certain real estate brokers had been employed by the plaintiffs to find purchasers for the property and the complaint alleges that in June, 1911, when Scott claimed that the option had terminated on account of the failure of plaintiffs to make a payment in May, the defendant, with intent to injure the plaintiffs in their business, wrongfully stated to different persons that the option had been forfeited and that he had wrongfully and

"with intent and design of injuring the plaintiffs in their said business of selling said lands, stated to each and every of said persons (brokers) that said contract was forfeited and void; that plaintiffs had no rights thereunder to engage in said business of selling said lands and each and every of said agents was thereby caused to and did cease and desist from all their efforts to thereafter find a purchaser or purchasers for said land."

Further complaining, the plaintiffs aver that the suit commenced by Scott in August, 1911, was prosecuted by him wrongfully, maliciously and without probable cause for the purpose of

"rendering doubtful and questionable the title and rights of the plaintiffs under said contract and for the purpose of injuring them in their business of selling said lands"; and that great publicity was given to the suit and "by reason thereof the plaintiffs' rights under said contract were rendered so doubtful that each and every of said real estate agents and brokers ceased and

desisted from all efforts to find a purchaser or purchasers for said lands, and no prospective purchaser could be induced to negotiate with the plaintiffs for the purchase thereof, and plaintiffs' said business was thereby injured and destroyed.''

The defendant is also accused of having stated to different persons, even after the rendition of the decree, which the Circuit Court rendered in September, 1912, that the option was void. The plaintiffs aver that they endeavored at all times to carry on their business, but that they were hindered and were unable to sell the land on account of the acts of defendant, to their damage in the sum of $10,000; and they therefore demanded a judgment for $10,000 plus $750 expenses for attorneys employed in the defense of the suit prosecuted by Scott.

The trial court directed a verdict for the defendant on the theory that it was incumbent upon the plaintiffs to allege and prove that they found a specified person who would have purchased had it not been for the words and acts of defendant.

The plaintiffs appealed.                AFFIRMED.

For appellants there was a brief over the names of *Mr. Porter J. Neff* and *Mr. Alfred E. Reames,* with an oral argument by *Mr. Neff*.

For respondent there was a brief over the names of *Mr. J. O. Stearns, Jr., Mr. B. F. Mulkey* and *Mr. George W. Cherry,* with an oral argument by *Mr. Stearns*.

MR. JUSTICE HARRIS delivered the opinion of the court.

The complaint alleges in general terms that the statements and conduct of Scott prevented the plain-

tiffs from selling the land; but there is neither allegation nor evidence to show that the language or acts of Scott deterred any specified person or persons from buying. The plaintiffs do not allege that they were negotiating with any named person who would have purchased had it not been for the statements and conduct of Scott. The plaintiffs contend that they are not obliged to allege or prove special damages, while the defendant argues that the action cannot be sustained unless the plaintiffs allege and prove that they suffered a pecuniary loss on account of having been prevented from effecting a sale to some designated person. The difference between the contentions made by the litigants results from the variant positions taken by them concerning the nature of this action. The plaintiffs say that they are suing for damages on account of words slandering their business, while the defendant insists that this is an action for damages predicated upon an alleged slander of title.

1-3. Language which does no more than to disparage the property of another or the quality of the articles which he manufactures or sells is not actionable unless special damages are alleged and proved; but if the language disparaging the property of another also involves an imputation upon him in respect to his trade, business or profession, then the language becomes actionable *per se* and it is unnecessary to allege or prove special damages: *Victor Safe etc. Co.* v. *Deright,* 147 Fed. 211 (8 Ann. Cas. 809, 77 C. C. A. 437); *Waters Pierce Oil Co.* v. *Bridwell,* 103 Ark. 345 (147 S. W. 64, Ann. Cas. 1914B, 837); *Marino* v. *Di Marco,* 41 App. D. C. 76 (Ann. Cas. 1914D, 1149, 48 L. R. A. (N. S.) 1214); *Sternberg Mfg. Co.* v. *Miller etc. Mfg. Co.,* 170 Fed. 298 (18 Ann. Cas. 69, 95 C. C. A. 494); *Quigley* v. *McKee,* 12 Or. 22, 24 (5 Pac. 347, 53 Am. Rep.

320); *Davis* v. *Sladden,* 17 Or. 259, 261 (21 Pac. 140); 25 Cyc. 326. Words to be actionable on the ground that they slander the business of a person must touch the person in his business; and as stated in Odgers on Libel and Slander (5 ed.), 52.

"They must be shown to have been spoken of the plaintiff in relation thereto, and to be such as would prejudice him therein. They must impeach either his skill or knowledge, or attack his conduct therein."

Newell on Slander and Libel (2 ed.), 174. Quoting from 25 Cyc. 327,

"words not actionable within themselves are not actionable when spoken of one in a profession or trade unless they touch him in his profession or business; that is, they must have such a close reference to such profession or trade that it can be said that they are defamatory by means of an imputation upon one in that character, as for example, an imputation upon him as a clergyman, a physician, or a tradesman, distinctly from and independently of being an imputation upon him as an individual. To be actionable it is not sufficient that the words merely be injurious to one whatever his pursuit, but they must prejudice him in the special profession or business in which he is actually engaged."

The defendant is charged with having stated to different persons that the option had terminated and that plaintiffs' rights had ended. Even though it is assumed that the attempt to sell the land was a business within the meaning of the rule invoked by plaintiffs, nevertheless the words charged against Scott do not involve an imputation which touches the plaintiffs in that business. There is no imputation that the plaintiffs were dishonest or deceitful or that they lacked capacity or skill or that they were violating any law in the pursuit of the alleged business. It may be

difficult sometimes to determine whether words spoken of a business, trade or profession involve an imputation touching the person in respect to his business, trade or profession; but, in the instant case, it is clear that the language ascribed to Scott does not involve any imputation touching the plaintiffs in their venture of attempting to sell the land for more than the option price. The instant case is in nowise analogous to any precedent cited by the plaintiffs where it has been held that the language complained of involved an imputation upon the persons and therefore amounted to a slander of the business; but, on the contrary, every adjudicated case upon facts like those presented here proceeds upon the theory that the title to the property, and not the business nor even the property itself, is slandered.

It is very doubtful whether the plaintiffs were engaged in a business within the meaning of the rule of damages concerning the slander of business. The option gave the plaintiffs the right to do a single act and when that act was done, nothing more remained to be done. The plaintiffs were engaged in a venture which, if accomplished, involved a single, isolated act, rather than a business which involved a series of similar transactions extending throughout a continuous period of time.

4-6. While the plaintiffs did not own the land they nevertheless had such an interest in it as would entitle them to damages from any person who slandered their title: Newell on Slander and Libel (2 ed.), 206. If Scott falsely and maliciously made the statements charged against him, he was guilty of slandering plaintiffs' title. The accepted rule is that a plaintiff in an action for damages for slander of title must allege and prove special damages, and it will not be enough merely to

allege in general terms that the complaining party intended to sell to any person who might buy; but he must allege and prove the loss of a sale to some particular person, for the loss of a sale to some particular person is the special damage, and is of the gist of the action: *McGuinness* v. *Hargiss,* 56 Wash. 162 (105 Pac. 233, 21 Ann. Cas. 220); *Burkett* v. *Griffith,* 90 Cal. 532 (27 Pac. 527, 25 Am. St. Rep. 151, 13 L. R. A. 707); *Wilson* v. *Dubois,* 35 Minn. 471 (29 N. W. 68, 59 Am. Rep. 335); *Lienan* v. *Lincoln,* 1 Duer (N. Y.), 670; *Harriss* v. *Sneeden,* 101 N. C. 273 (7 S. E. 801); *Hopkins* v. *Drowne,* 21 R. I. 20 (41 Atl. 567); 25 Am. & Eng. Enc. of Law (2 ed.), 1079; 25 Cyc. 248; Odgers on Libel and Slander (5 ed.), 80.

7. In addition to the damages claimed on account of the loss of a sale of the land, plaintiffs allege that they incurred an expense of $750 for attorneys in the defense of the suit prosecuted by Scott, and they contend that they are entitled to be reimbursed in this action. The decree in the suit was for Hubbard, Zimmer and Schutt and the decree rendered there is supposed to have reimbursed them for any expenses incurred in the defense of the suit. It is true that the fees fixed by statute, and technically known as costs, did not furnish full compensation for the services of attorneys, and, for that reason, at least one court has permitted a complainant in an action for slander of title to recover a reasonable sum previously expended for the services of an attorney in a suit to quiet title: *Chesebro* v. *Powers,* 78 Mich. 472 (44 N. W. 290); but the weight of authority is to the contrary: *Cohen* v. *Minzesheimer,* 118 N. Y. Supp. 385; *Cormier* v. *Bourque,* 32 N. Bruns. 283; *Ashford* v. *Choate,* 20 U. C. C. P. 471; see also: *Brentman* v. *Note,* 24 N. Y. St. Rep. 281, 3 N. Y. Supp. 421; *McGuinness* v. *Hargiss,* 56 Wash.

162 (105 Pac. 233, 21 Ann. Cas. 220). The decree awarded to the defendants in the suit, the plaintiffs here, is supposed to have adjudged to the prevailing parties all sums to which they were entitled on account of expenses incurred there. The defendants in the suit could not have recovered $750 as a part of their disbursements there: *McGuinness* v. *Hargiss,* 56 Wash. 162 (105 Pac. 233, 21 Ann. Cas. 220); nor can they recover here for a disbursement made there: *Yuen Suey* v. *Fleshman,* 65 Or. 606, 614 (133 Pac. 803, Ann. Cas. 1915A, 1072). The judgment is affirmed.

Affirmed.

Mr. Chief Justice McBride, Mr. Justice Bean and Mr. Justice Burnett concur.