SUMMA CORPORATION, A DELAWARE CORPORATION, APPELLANT AND CROSS-RESPONDENT, v. HERMAN M. GREENSPUN AND BARBARA J. GREENSPUN, HIS WIFE, RESPONDENTS AND CROSS-APPELLANTS.

No. 10412

December 13, 1982                    655 P.2d 513

[Petition for rehearing filed December 28, 1982, denied February 16, 1983]

*Lionel Sawyer & Collins,* Las Vegas; *Cromer, Barker & Michaelson,* Las Vegas; *Vaughan, Hull & Copenhaver,* Elko, for Appellant and Cross-Respondent.

*Denton and Denton,* Las Vegas; *Jules Yablok,* Las Vegas; *Bradley & Drendel,* Reno, for Respondent and Cross-Appellant.

*Nevada Trial Lawyers Association, Amicus Curiae.*

## OPINION

By the Court, THOMPSON, D. J.:[1]

We granted the petition for rehearing because it appeared that the original opinion filed herein may have overlooked or misapprehended the nature of the cause of action respondents asserted and pursued in the trial court and the trial judge's rulings with respect to the relief sought. The rehearing was granted as to the issue relating to the propriety of an award of punitive damages and the defendant Summa's liability therefore. With respect to these issues we alter the views expressed in

---

[1]The Honorable James H. Thompson, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of JUSTICE NOEL E. MANOUKIAN, who voluntarily disqualified himself. Nev. Const., art. 6, § 4.

Summa Corp. v. Greenspun, 96 Nev. 247, 607 P.2d 569 (1980), and affirm the decision and judgment of the trial court in its entirety.

I

The 1968 oral contract for rescission was to rescind the proposed sale of a 2,000 acre parcel and return the conveyancing and security documents. There was no promise sought by the Greenspuns, and none was given by Summa, that the deed of trust not be recorded. It was not necessary to bargain for this advantage. It was a legal right already possessed by the Greenspuns under the common law, the violation of which constituted the tort of slander of title. Summa's duty not to record arose the instant the sale was rescinded and not because Summa promised to return the deed of trust. It cannot be seriously contended that since Summa did not specifically promise not to record, Summa would not be liable if it did so. The duty not to publish disparaging matter exists independently of the contract. Moreover, if the proposed sale had been consummated, Summa would have been entitled by law not by contract, indeed under a duty, to record the deed of trust to impart notice to third persons. NRS 111.315. Thus, the duty not to publish matter disparaging one's title, a duty which was violated here, arose not from the oral contract for rescission, but arose from a duty imposed by the common law, violation of which is a tort.

The complaint as framed is in accord with the law just stated. The complaint is devoid of any allegation as to an agreement of rescission between the parties or its breach. The complaint sets forth a cause of action for slander of title and seeks damages for the recording by the defendant of the alleged void deed of trust. The complaint also prayed that the deed of trust be declared null and void. The recovery of damages for recording of an alleged slanderous document without seeking expungment of that document for the public records would not give the plaintiffs complete relief. The title to the property would be clouded as long as the document is a public record and its nullity not declared.

It follows that plaintiffs' complaint for a declaration that the deed of trust was a nullity and void was not a separately stated cause of action. Instead, it was a necessary part of plaintiffs' claim for relief if the tort of slander of title to property is to afford a meaningful remedy.

The trial judge correctly concluded as a matter of law that the plaintiffs "pleaded and alleged a cause of action for Slander of Title, not a Breach of Contract." The trial judge also

correctly concluded as a matter of law that proof of the oral rescission agreement was necessary only to establish plaintiffs' right to have the deed of trust expunged from the public records. In our previous opinion we misapprehended this prayer for relief as an independent cause of action stemming from a breach of the oral contract for rescission. We hold that it is not and that it is concomitant relief along with any recoverable special damages. Therefore an action for slander of title can be maintained if the plaintiffs have incurred special damages by reason of the recording of the disparaging document.

## II

We turn to the question as to whether there must be a showing that vendibility of the land must be adversely affected to support an action for slander of title, or whether the proof of other actual damages is sufficient.

It was said in Potosi Zinc Company v. Mahoney, 36 Nev. 390, 135 P. 1078 (1913), that maintenance of a slander of title action required a showing of special pecuniary damages. But this requirement was never addressed in *Potosi* because there the plaintiff did not ask for any pecuniary damages. 36 Nev. at 400. *Potosi* thus does not stand for the proposition that special pecuniary damages are only those which flow from an impairment of vendibility of the property.

There is authority that a complaint for slander of title is subject to dismissal if it fails to allege the loss of a particular pending sale. Burkett v. Griffith, 27 P. 527 (Cal. 1891); Wilson v. Dubois, 29 N.W. 68 (Minn. 1886); Hubbard v. Scott, 166 P. 33 (Ore. 1917); Shell Oil Co. v. Howth, 159 S.W.2d 483 (Tex. 1942); McGuinness v. Hargiss, 105 P. 233 (Wash. 1909). There is also authority that where plaintiff has alleged and shown that a pending sale was aborted by publication of disparaging matter, special pecuniary damage is established. Ideal Savings Loan & Building Assn. v. Blumberg, 175 S.W.2d 1015 (Ky. 1943).

The courts have also allowed as the only special damage in slander of title actions the expense (in addition to taxable costs of suit) of removing the cloud upon a plaintiff's title, and such has been deemed not a bar to maintaining the action for slander of title.

In Chesebro v. Powers, 44 N.W. 290 (Mich. 1889), plaintiff claimed only damages for the expense he incurred in bringing and maintaining the action for slander of title, an action in which a deed and mortgage were declared void, a cloud upon the title was removed, and in which plaintiff could not be compensated by taxable costs of suit. The Michigan Supreme Court

held the plaintiff entitled to recover as his damages the reasonable outlay incurred in removing the cloud and that such damage was not a bar to the action. Other courts have reached a similar result when the plaintiff did not show a pecuniary damage from impaired vendibility but could establish expenses incurred in the removing of the cloud from his title.

The Utah Supreme Court in Dowse v. Doris Trust Co., 208 P.2d 956 (Utah 1949), relied upon *Chesebro* and held that the trial court acted properly in directing a verdict in favor of the plaintiff as to expenses and costs as special damages. Paulson v. Kustom Enterprises, Inc., 483 P.2d 708 (Mont. 1971), held attorneys fees were recoverable as items of special damages in a slander of title action. More recently the New Mexico Court of Appeals in Den-Gar Enterprises v. Romero, 611 P.2d 1119 (N.M.Ct.App. 1980), *cert. denied,* 614 P.2d 545 (N.M. 1980), that the plaintiff incurred special damages in defending against a slander of title and removal of the cloud upon title.

Arrayed against this trend is the Texas Supreme Court's recent decision in overruling two Court of Appeals decisions and reaffirming its early holding in Shell Oil Co. v. Howth, *supra,* that a plaintiff must plead and prove a pending sale was lost because of the slander of title. A. H. Belo Corp. v. Sanders, 632 S.W.2d 145 (Tex. 1982).

We believe the rationale of *Chesebro, Dowse, Paulson* and *Den-Gar* is based on reason and recognizes that but for the wrongful act of slander of plaintiff's title, the plaintiff would not incur any expenses in removing the cloud from his title. Dowse v. Doris Trust, *supra,* at 959. Furthermore, the Restatement (Second) of Torts, § 633(1)(b) (1977) is in accord with this view. Therefore, the trial court properly concluded that an award of expenses was an element of special damages and sufficient to establish the tort of slander of title.

## III

Summa challenges the trial judge's finding that Howard Hughes was its managing agent in Nevada. The record reveals that Hughes acted through Robert Maheu and Richard Gray. Gray was Summa's attorney and also held powers of attorney from both Hughes and Summa. Through them, Hughes negotiated the 1967 transaction and its revision in 1969 and partial rescission of the revised terms of sale. From the day Hughes moved to Las Vegas, he determined and directed the course of Summa's activities and investments within Nevada. The trial court found that "with this set-up, Mr. Hughes had complete control of the Hughes Nevada Operation." After Hughes

departed Las Vegas on Thanksgiving Day in 1970, and members of Summa's board of directors arrived in Las Vegas soon thereafter, Hughes continued to exert his influence on Summa's board. Summa's general counsel and director, Chester Davis, became the recipient of the written memos from Hughes. Hughes also "approved" the Summa board of director's action to oust Maheu from control of the Hughes Nevada Operation and asked the board to obtain a full accounting of all funds and property to which Maheu may have had access. That Hughes was monitoring the events in Las Vegas as they related to the plaintiff is further shown by the receipt of one of the memos by Davis as late as August 5, 1974, after this litigation was commenced. We hold that there is substantial evidence in the record to support the trial judge's finding that Hughes, the sole stockholder of Summa, was the managing agent of Summa's Hughes Nevada Operation.

## IV

Skeels v. Universal C.I.T. Credit Corp., 335 F.2d 846 (3rd Cir. 1964), is urged as being similar to the case before us and as precluding an award of punitive damages. There, one of Universal's employees made repeated promises to Skeels that a note would be extended. In ignorance of these promises others in authority at Universal exercised the corporation's rights against the defaulting borrower under the loan agreement. The Court of Appeals stated that there was no indication or suggestion that this was done with knowledge of the agent's promises to extend credit. The Court of Appeals observed that the doctrine of respondeat superior may result in corporate liability for what the right hand did in ignorance of the inconsistent behavior of the left and termed such "excusable ignorance," which it found was an unwarranted predicate for an award of punitive damages.

There was no question in *Universal* of the authority or actions of its agent's wielding corporate authority; there were no allegations of ill will, oppression or malice toward the borrower. Universal had a contractual right to foreclose its security. As contrasted to the absence of any suggestion of knowledge by Universal's agents, there is evidence in the case before us that one or more of Summa's directors may have had knowledge of the oral rescission and the void deed of trust. Director Collier was informed by Gray of the new sales agreement in 1969 and of the extension of the 1967 note. Gray later corresponded with Collier and urged Collier not to let Greenspun off the hook on his note. Collier was also Summa's treasurer and arranged for transmission of funds for the

transactions. Summa's officials also had possession of the Second Note which states that it was "in renewal, rearrangement and extension" of the 1967 note. Summa also accepted the Greenspuns' payments of interest on the Second Note. Summa never demanded payments on the 1967 note. In fact, Summa's director of finance wrote the Greenspuns to confirm the fact that the Second Note was in force. The Greenspuns' attorneys made several unsuccessful demands upon Summa for return of the first note and deed of trust. These demands led to Davis's threats nine months earlier that the land transactions with the Greenspuns would be used to get at Hank Greenspun and embarrass him. Furthermore, one of Summa's attorneys, Tom Bell, had also advised Summa that the Second Note was the effective note. The deed of trust was recorded the same day the board of directors authorized its recording. All this points to knowledge on the part of some of Summa's officers and directors that Summa's rights in the matter were as stated in the Second Note. The trial judge, recognizing that some of the directors may have been less than innocent in the matter, concluded that Director Davis's investigation as general counsel and the resultant legal opinion created a smoke screen to make it appear the board of directors was acting in good faith. Nevertheless, the trial judge found that the board, as a board of directors, never was notified by Hughes or anyone of the oral rescission and the agreement to return the deed of trust to the Greenspuns. On the state of this record we find no parallel with *Universal, supra.*

## V

Summa argues that there is no competent evidence to support a finding that Hughes bore malice toward Greenspun at the time the deed of trust was recorded. Summa also argues that the trial judge wrongly relied on statements of Hughes and others made long after the recording. Soon after Summa's Directors Davis and Frank W. Gay arrived in Las Vegas, they arranged for a telephone call from Hughes to then Governor-elect Paul Laxalt. Also present were District Attorney George Franklin and Gaming Control Board Chief Frank Johnson. Franklin testified that Davis said, "once they got rid of Mr. Maheu they were going to start on Mr. Greenspun. This was a very sore spot with their *employer,* Mr. Hughes, the publicity he was getting, they were going to start in on Mr. Greenspun over some land transactions that had been handled by Dick Gray, and even though it embarrassed Mr. Gray." (Emphasis supplied.) Franklin and Johnson also testified to statements by Davis that "we might even end up owning Hank's newspaper"

and that if the Las Vegas Sun kept up its publicity "we'll own the paper." Davis was also heard to threaten Maheu and Greenspun with jail. These statements alone are sufficient to justify inferences that the land transactions between the Greenspuns and Hughes were to be used to get "rid of" Greenspun, that Hughes was "sore" because of Greenspun's public support in his newspaper of Maheu in his fight against being ousted by Davis and Gay, and that if Greenspun did not desist that they would take over the Las Vegas Sun. During this time Davis was not only a director of Summa but was also representing his "employer," Mr. Hughes. These statements adequately support the trial judge's finding of Hughes's anger and hostility toward Greenspun and Davis's expressions of malice being primarily a reflection of Hughes's feelings. The trial judge found that this animosity continued as Hughes and his agents were frequently "burned" by Greenspun in the Las Vegas Sun. The trial judge's finding does recount statements of animosity by Hughes and Davis subsequent to the recording of the deed of trust which show that the malice and animosity attributed to Hughes continued thereafter.

## VI

The cause of action pursued and established below by Greenspun was in tort for slander of title. NRS 42.010 permits in addition to actual damages an award of punitive damages when the defendant is guilty of oppression, fraud or malice, express or implied. The trial court's conclusions that express malice motivated Hughes's actions toward Greenspun in allowing the void deed of trust to be recorded, that Hughes was the managing agent of Summa, that Hughes benefitted his principal Summa by his actions as managing agent, and that the malicious acts of Hughes were to be imputed to Summa are all amply supported by the record before us. We write on a faceless and impersonal record. The trial judge saw and heard the witnesses, and we pay the usual deference to the weight he gave the evidence and credibility of the witnesses.

Summa is a tort-feasor in the case at bar, and the subsequent death of its agent Hughes does not absolve it from liability for Hughes's actions. *See,* 19 Am.Jur.2d *Corporations* § 1428 (1965). Moreover, a sole stockholder's actions may bind the corporation where the rights of its creditors are not prejudiced thereby. *See,* 18 Am.Jur.2d *Corporations* § 485 (1965).

The trial judge's award of punitive damages was proper.

While the amount of one million dollars in punitive damages will seem large to most, it is not large, let alone excessive, in light of Summa's financial net worth adduced at trial.

Judgment of the trial court is affirmed.

SPRINGER, J., GABRIELLI, D. J.,[2] SCHOUWEILER, D. J.,[3] and YOUNG, D. J.,[4] concur.