700 P.2d 567

**Bill RAYL, Plaintiff-Respondent, Cross-Appellant,**

v.

**SHULL ENTERPRISES, INC., a corporation, Defendant-Appellant, Cross-Respondent,**

and

**Jack R. Smith, Defendant, Cross-Respondent.**

No. 15030.

Supreme Court of Idaho.

July 25, 1984.

On Rehearing May 8, 1985.

John Hepworth, of Hepworth, Nungester & Felton, Twin Falls, for defendant-appellant, cross-respondent.

Lloyd J. Webb, of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiff-respondent, cross-appellant.

BAKES, Justice.

This case involves an appeal and cross appeal from a judgment attempting to settle a dispute between a corporate landlord and a farm tenant over the termination of a lease of farmland. We reverse the judgment of the trial court and remand for final determination and resolution in accordance with the views expressed herein.

Shull Enterprises (Shull) is a closely held family corporation owned by descendants of Nora Rayl. Bill Rayl, respondent and cross appellant, is a minority shareholder in Shull. Beginning in 1962, Rayl and Shull entered into successive written leases of farm property (the Hollister farm) owned by Shull. The agreements provided for a sharecrop arrangement, wherein rent was paid by crediting Shull with a percentage of the crops grown on the land by Rayl. The last written lease entered into between the parties was signed February 9, 1970. That lease by its terms expired December 31, 1974. After 1974, however, Rayl remained in possession of the property by apparent agreement of the parties, without a written lease, until 1981, when he was dispossessed by order of the trial court.

In 1980, the corporation decided to sell the Hollister farm property. Rayl made at least two offers to buy the farm, both of which were rejected. On November 22, 1980, at a directors' meeting, Rayl was advised that his lease would be terminated December 31, 1980, and the corporation would sell to an outsider if an agreement to sell to Rayl could not be reached. Rayl was later served with two written termination notices, one served January 6, 1981, and the other January 12, 1981, asking that he vacate the premises by February 15, 1981.

On November 5, 1980, Rayl filed a labor lien against the property, seeking compensation for labor performed such as clearing sagebrush, installing ditches, leveling the property, and installing fencing, all of which was done between 1963 and 1967. On December 30, 1980, Rayl filed this action seeking a judicial determination that proper notice of termination had not been given, asking that Rayl be allowed to occupy the premises in 1981, and also seeking to foreclose the labor lien. Shull filed a counterclaim seeking eviction of Rayl and removal of the lien. The counterclaim also alleged a cause of action for slander of title and sought an accounting between the parties, and included an offer to compensate Rayl for his interest in a pivot irrigation system located on the land.

On March 13, 1981, a partial summary judgment was entered in favor of Shull, finding an unlawful detainer of the property as of February 15, 1981, and ordering Rayl to vacate the premises. The summary judgment also found the lien to be invalid. The court reserved questions of damages for a later trial.

Rayl vacated the farmhouse on March 31, 1981, but did not remove his cattle from pastureland until late April and early May and did not remove all of his personal property from the land until May. When Rayl vacated the premises, he removed a pivot irrigation system in which he owned a two-thirds interest, with the corporation owning a one-third interest. Removal of the system required the removal of underground electrical cables and piping.

On September 25, 1981, by consent of both of the parties, Shull filed an amended counterclaim, realleging the unlawful detainer (which by this time had already been decided by the court) and asking for reasonable rental value as damages and, in addition, seeking treble damages under I.C. § 6–301. The complaint realleged the slander of title allegations, and the allegations of the necessity of an accounting. In addition, a new counterclaim was added alleging conversion of Shull's interest in the pivot irrigation system and alleging that the irrigation system was a fixture and that by removing that fixture Rayl committed physical and economic waste upon the property. Shull also sought punitive damages, alleging that the actions of Rayl were willful, malicious and intentional.

A trial was held to resolve the remaining issues between the parties, including damages. On January 4, 1983, the trial court issued Findings of Fact and Conclusions of Law, finding Rayl liable for the reasonable rental value of the land only for the period of time after March 31, 1981; finding that no damages had been proven on the slander of title count; that the irrigation system was not a fixture, and that no waste was committed upon the land; and finding that no punitive damages, no treble damages, and no prejudgment interest would be allowed. Shull has filed an appeal from this judgment, and Rayl has filed a cross appeal.

Numerous issues are raised on the appeal and cross appeal. These include: (1) whether the trial court erred in finding that the pivot irrigation system was not a fixture; (2) whether the trial court erred in ruling that the attorney fees incurred in seeking to remove the false lien from the real property could not constitute those special damages necessary in proving slander of title; (3) whether the trial court erred in not allowing 18% interest on the judgment; and (4) various other alleged errors, including the failure of the trial court to allow damages for prejudgment interest, unpaid rent, treble damages, punitive damages, attorney fees, and recovery for improvements allegedly made to the real property. We find that the trial court did err in its treatment of the first three items of the above list, but that no error was committed as to those items listed under (4). We thus reverse for consideration of additional damages due because of the errors noted.

I

We first consider whether the pivot irrigation system was a fixture. Two center pivot irrigation systems were purchased between the years of 1974 and 1976 for purposes of irrigating the farmland. At the time of the initial purchase, Rayl paid two-thirds of the purchase price of each pivot, and Shull paid the other one-third. The system was generally described by Rayl during his testimony.

"Q. All right. Would you explain to the court what that system that was then installed consisted of?

"A. It consisted of a pump and motor, electrical control box, underground pipe that went from the pump to the pivot point, the electrical wiring that went from the control boxes to the pivot point, a quarter mile of overhead pipe that consists of the pivot.

. . . .

"Q. And this system that you then acquired, it consisted of a buried pipeline three or four feet under ground; isn't that true?

"A. Yes.

"Q. And then it came up, that buried pipeline, to this circle that was purchased in 1974 and used in 1975 into a big cement pad which handled the pivot around which the arm rotated; is that not right?

"A. Yes.

"Q. And that pivot was securely affixed to that property by means of a cement slab and bolts and other means to securely fasten it to the real estate; isn't that right?

"A. It was—yes. It was fastened by bolts on the corners.

"Q. And then that circle, including the arm, were all tied together or connected

together to form one unit; isn't that true?

"A. Yes."

When the pivot system was installed, a gravity irrigation system, composed of a series of ditches, was removed by pulling out cement checks through which the water flowed and filling in the ditches.

The trial court found that there had always been an understanding between the parties that each of them owned a portion of the pivot irrigation system, but that no system for reimbursement had yet been agreed upon. Testimony of various officers of the corporation indicated that the corporation intended to pay Rayl for his contribution to the system, but that he had refused payment at various times. Other testimony indicated the possibility that the corporation had chosen not to conduct a reimbursement program before this dispute began.

The testimony is undisputed that Rayl removed the pivot irrigation system when he was ordered to vacate the premises by the court. Removal of the system included digging up the main line and piping, which consisted of plastic and steel water pipes and an electrical conduit, all of which were buried three to four feet under ground, cutting the wires of the electrical conduit, and removal of the pumps and motors, including removal of a cement slab that was buried in the ground.

The classification of a particular item as a fixture is a perpetual problem in the landlord/tenant area. In Idaho, tenants are generally allowed to remove fixtures from leased premises during their term if the removal can be effected without injury to property, so long as the fixture has not become an integral part of the premises. I.C. § 55–308. *See also Beebe v. Pioneer Bank & Trust Co.,* 34 Idaho 385, 201 P. 717 (1921). Generally, the problem is resolved by application of three general tests.

"[I]n determining whether a particular article has become a trade fixture, three general tests are to be applied: (1) annexation to the realty, either actual or constructive; (2) adaptation or applica-tion to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) intention to make the article a permanent accession to the freehold." *Pearson v. Harper,* 87 Idaho 245, 256, 392 P.2d 687, 693 (1964).

Other than the trial court's findings concerning the ownership interests in the pivot irrigation system and the value of the system, the trial court made only one finding of fact concerning the system. That finding reads: "When Rayl left the premises, he removed a buried pipeline and electrical system and took with him two irrigation pivots." From that finding of fact, the trial court issued a conclusion of law that "the pivot irrigation systems complete were not fixtures legally attached to the realty and instead had retained their character of personalty." There is no indication that the trial court considered any of the three tests normally applied in situations such as these to determine whether a particular object had become a fixture.

■ Normally, the determination of what is a fixture is a mixed question of law and fact. *State, Dept. of Revenue v. Boeing Co.,* 85 Wash.2d 663, 538 P.2d 505 (1975). *See also* Thompson, Real Property, § 55 (1964). However, application of the three-part test becomes a pure question of law when only one reasonable conclusion may be drawn from the evidence. *Wisconsin Dept. of Revenue v. A.O. Smith Harvestore,* 72 Wis.2d 60, 240 N.W.2d 357 (1976). *See also Beebe v. Pioneer Bank & Trust Co., supra* 34 Idaho at 393, 201 P. 717 ("Applying the tests laid down in the above decision to the property in question, in light of the evidence, the door to the bank vault was clearly part of the realty, and it would have been proper for the court to have so instructed the jury.").

■ The first part of the test, that of annexation, is often considered in light of the actual relationship of the object to the realty. In addition, a fixture may be constructively annexed to the real property. *See Beebe v. Pioneer Bank & Trust Co., supra.*

"Even more importantly, however, the cases and authorities recognize that the annexation which renders the object a fixture may be not only actual, but also constructive. Thus, constructive annexation may be found where the objects, although not themselves attached to the realty, comprise a necessary, integral or working part of some other object which is attached ...." *Seatrain Terminals of California v. County of Alameda*, 83 Cal.App.3d 69, 147 Cal.Rptr. 578, 582 (1978).

Thus, in *Wisconsin Dept. of Revenue v. A.O. Smith Harvestore, supra,* while noting that a large silo was attached to a concrete foundation through the use of bolts, the court ruled that an annexation had occurred because the silo was firmly attached as one unit. In *Seatrain Terminals of California v. County of Alameda, supra,* the court ruled that large 750-ton cranes, although not themselves attached to the realty, were attached by reason of their enormous weight to rails which were embedded in the wharf and thus, since the cranes comprised a necessary and integral part of the rails, an annexation had occurred.

The adaptation test is generally held to be met when the particular object is clearly adapted to the use to which the realty is devoted:

"The question most frequently asked is whether the real property is peculiarly valuable in use because of the continued presence of the annexed property thereon .... [A]n object placed on the realty may become a fixture if it is *a necessary or at least a useful adjunct to the realty,* considering the purposes to which the latter is devoted." *Seatrain Terminals of California v. County of Alameda, supra* at 582 (emphasis in original).

 The test of the intention in installing the object is regarded as the most important of the three factors. The intention sought is not the undisclosed purpose of the annexor, but rather the intention implied and manifested by his act. *Beebe v. Pioneer Bank & Trust, supra.* Thus,

the intent should be determined from the surrounding circumstances at the time of installation, and not necessarily from testimony as to the subjective intent of the installer and his frame of mind at the time of installation. *See State, Dept. of Revenue v. Boeing Co., supra.*

"[T]he inquiry is not strictly as to the intention of the person himself who annexed the chattel to the freehold ..... The inquiry is as to what intention must be imputed to him in the light of all the circumstances, when tested by the common understanding of those familiar with the subject." *Beebe v. Pioneer Bank & Trust Co.,* 34 Idaho 385, 392, 201 P. 717, 719 (1921) *(quoting from Boise Payette Lumber Co. v. McCornick,* 32 Idaho 462, 186 P. 352 (1919)).

An Oregon court had the opportunity to consider a question very similar to that presented in this case. In *Johnson v. Hicks,* 51 Or.App. 667, 626 P.2d 938 (1981), the court considered whether an irrigation system on the plaintiff's land, which had been removed by plaintiff's former brother-in-law, was a fixture and thus had passed to plaintiff by reason of a divorce decree declaring the real property to be plaintiff's. Certain statements included by the court in its opinion are peculiarly applicable to the present situation.

"[I]t is apparent that ... whoever installed the irrigation system on the farm, did so with a view to enhancing the production of the farm, to increase the growth of vegetation thereon. Irrigation in a semi-arid region ... is the very life of the land. It is beyond comprehension that the system was installed for any temporary purpose." *Id.* at 941 *(quoting from First State, etc. Bank v. Oliver,* 101 Or. 42, 198 P. 920 (1921)).

The court held that the irrigation system, although movable, was intended to have been annexed to the land for purposes of irrigating the farmland, and thus could be classified as a fixture.

 All of these factors, when considered within the context of the present fact situation, can lead only to one conclu-

sion—that the irrigation system was a fixture permanently attached to the land. The system was annexed to the land, either constructively or actually, in that it was bolted to cement slabs buried in the ground, and attached to pipes and electrical wires which were buried three to four feet underground. Removal of the system necessitated digging up these buried wires and pipes, which could only result in some damage to the realty itself. *See* I.C. § 55–308.

The irrigation system was also clearly adapted to the land. The purpose and use of the land in question was that of farming. Irrigation is peculiarly necessary to a farming operation conducted in Idaho. This particular irrigation system was adapted to the particular ground being farmed.

Finally, there could only be one intent inferred considering circumstances surrounding the attachment of the system to the realty. In this case, a farmer installed a necessary and integral irrigation system for the purpose of developing and farming the land in the manner he had been accustomed to. The gravity system in place before the present system was installed was destroyed, indicating that it was no longer necessary to have the gravity system because of the permanent installation of another irrigation system.

This case is one of that type wherein the facts are so clear that only one result could be reached; thus, we can determine as a matter of law that the irrigation system under consideration here was a fixture. It is clear that error was committed in the trial court's conclusion that the system was not a fixture. Therefore, this case must be reversed so that the trial court may determine what further damages, including possible punitive damages, must be awarded because of the waste committed by the tenant in removing this fixture.

## II

We next consider the slander of title count. After it became apparent that a sale of the farm was imminent, Rayl filed a labor lien. This lien alleged an obligation on the part of Shull to compensate Rayl for fencing, ditching, leveling and clearing of the land, all work that he performed from the time he began farming the premises in 1962 until approximately 1967. Thus, this claim was allegedly for work performed some thirteen years before this dispute arose. Clearly this was not a valid lien, and was declared invalid by the trial court. Even Rayl's attorney did not seem sure of the validity of the lien, as he indicated in oral argument before the trial court that:

> "[W]e will agree to strike that lien or have the court strike it. This does not mean that we have no right to the claim that was attempted to be illustrated by the lien which frankly I had in mind more or less as a lis pendens in the event that something could not be worked out between these parties. And that possibility, of course, is still available unless the court totally dismisses this case. But at least for our purposes right now I think there is no right to a lien against the property."

Thus, when Shull filed its counterclaim it alleged a slander of title had occurred because of a filing of the labor lien. The trial court found: "All claims of liens filed by Rayl were barred .... The wrongful recording of such patently unenforceable claims against Shull's realty constitutes slander of title." However, the trial court also found that: "The slander of title, though established, is not compensable without damages, which were not established." However, the trial court did allow Shull to recover as costs its attorney fees and court costs incurred in attempting to remove the lien which constituted the slander of title. Thus, Shull alleges that a slander of title had been proved, in that compensable damages, or special damages, were proven, and thus the trial court erred in its basic premise that a slander of title, which cannot be established without proof of special damages, was not present in this case.

We have previously considered the elements of slander of title. In *Matheson v. Harris*, 98 Idaho 758, 572 P.2d 861

(1977), we noted that there are four essential elements to the cause of action which include: "(1) The uttering and publication of the slanderous words by the defendant; (2) the falsity of the words; (3) malice, and (4) special damages ...." *Id.* at 759, 572 P.2d 861 (footnote omitted). Thus, special damages must be alleged and proven before one can recover for slander of title. The trial court in this case found that all the other elements of slander of title were proven. That finding is supported by substantial competent evidence and will be upheld. However, the trial court erred when it ruled that the attorney fees and costs expended by Shull in its attempt to remove the false lien from its property did not constitute those special damages required in a slander of title action. As noted in Prosser, Torts, § 128, at p. 922: "Likewise it would appear obviously to include the expenses of legal proceedings necessary to remove a cloud on the plaintiff's title, or other expenses to counteract the disparagement ...." As noted by a New Mexico court, "In a slander of title action the plaintiff must prove actual pecuniary damage, and proof of attorneys' fees and other costs of a quiet title suit to remove the slander are such pecuniary damages." *Den-Gar Enterprises v. Romero*, 94 N.M. 425, 611 P.2d 1119, 1124 (App. 1980). Although some courts have ruled that a slander of title action must be dismissed if it fails to allege the loss of a particular pending sale, as urged by Rayl, *see Shell Oil Co. v. Howth*, 138 Tex. 357, 159 S.W.2d 483 (1942), other courts have allowed maintenance of a slander of title action where the only special damage shown was the expense of removing the cloud upon a plaintiff's title. *See Summa Corp. v. Greenspun*, 655 P.2d 513 (Nev.1982). Thus, in *Summa Corp. v. Greenspun, supra,* after considering those cases where attorney fees incurred were allowed as a special damage, the court said: "We believe the rationale of [these cases] is based on reason and recognizes that but for the wrongful act of slander of plaintiff's title, the plaintiff would not incur any expenses in removing the cloud from his title." *Id.* at 515. We agree with the reasoning of the court in *Summa Corp. v. Greenspun, supra*. It seems clear that, but for the slander of title caused by the filing of a false lien, Shull would not have incurred the excessive amount of attorney fees directly attributable to removal of the lien and the cloud from the title of the property. Thus, the trial court erred in ruling that no special damages have been proven. Upon remand, the trial court should award those attorney fees and costs as damages for the slander of title, and should also consider whether, in its discretion, punitive damages should be awarded based upon the establishment of a cause of action for slander of title.

### III

■ Appellant also alleges that the trial court erred in assessing interest on the judgment awarded to Shull at only 12% interest. This judgment was issued April 8, 1983. The statute governing interest on judgments was amended effective June 30, 1981, to read:

"**28-22-104. Legal rate of interest.**— ...

....

"(2) The legal rate of interest on money due on the judgment of any competent court or tribunal shall be eighteen cents (18¢) on the hundred by the year."

Thus, it seems clear that the trial court was required by this statute to award interest on the judgment at the rate of 18%, instead of the 12% actually awarded by the court. Upon remand, the trial court is directed to correct this error in this judgment.

### IV

We have considered all of the other errors alleged by both appellant and respondent, dealing with treble damages, punitive damages other than as referred to in Paragraphs I and II above, further alleged rental damages, interest, and attorney fees. We find that no error was committed by the trial court in its handling of these subjects.

Reversed and remanded for further proceedings consistent with this opinion. Costs to appellant.

DONALDSON, C.J., and BISTLINE and HUNTLEY, JJ., concur.

SHEPARD, Justice, concurring in part and dissenting in part.

I concur in parts II and III of the Court's opinion, but dissent as to part I.

I believe the majority opinion errs in part I wherein it fails to distinguish between the various portions of the irrigation system, but rather reasons as a matter of law that the entire system was a fixture and therefore Rayl was not entitled to remove any part thereof when he was ordered to vacate the property. As acknowledged by the majority, Rayl owned a two-thirds interest in the irrigation system. The trial court ruled that the "pivot irrigation systems complete" were not fixtures. In my view, that ruling is ambiguous, to the extent that it cannot be determined whether the ruling encompasses only the pivots which, by their nature and design, were mobile and moved across the land in a circular manner being attached at one end or whether the ruling intended to encompass also the underground piping and electrical systems which delivered the water and power to the pivots. If the ruling of the trial court was meant to encompass not only the pivots but the underground portion of the system, then I believe the trial court erred.

In my view, the irrigation pivots were, by their nature and design, personalty rather than fixtures. They were designed to be and were in fact mobile. Utilizing the approach of the majority, one could as well argue that a portable carousel or ferris wheel is a fixture, which would engender considerable surprise to operators of portable carnivals.

I agree that the cause must be remanded in accordance with the majority's disposition of parts II and III. As to part I, I would remand that portion of the cause to the trial court for a determination of that portion of the irrigation system which actually constituted a fixture, excluding therefrom the actual irrigation pivots. In my view, Rayl had the right to remove the actual irrigation pivots, and the trial court was correct in attempting to determine the value of Shull's interest (one-third) in those pivots. The trial court utilized the systems value of $36,100 before its removal from the property and the value at $18,600 following the removal. Thereafter, the trial court awarded Shull one-third of the $36,100, or $12,033. In my view, the trial court erred and Shull was entitled to an award of only one-third of the $18,600, or $6,200. Obviously, Shull should therefore be awarded the value of that portion of the irrigation system which constituted a fixture to the property.

## ON PETITION FOR REHEARING

A petition for rehearing in the above entitled action having been granted and the cause reargued, the Court has reviewed the record and considered the arguments presented by counsel. Chief Justice Donaldson and Justices Bakes and Huntley continue to adhere to the views expressed and the conclusion heretofore reached in its 1984 Opinion No. 95, issued July 25, 1984. Justice Shepard continues to adhere to the views formerly expressed in his separate opinion.

Justice Bistline no longer joins the opinion of the Court, but separately dissents.

BISTLINE, Justice, dissenting.

The petition for rehearing emphatically stated:

What the opinion of this Court basically comes down to is that every irrigation system installed upon a farm becomes a "fixture." In Idaho we no longer consider the relationship of the claiming parties, the relative difficulty of removal, or the nature of the article annexed ....
Nor do we consider the previous rulings of this court. See, *Duff v. Draper*, 98 Idaho 379 [565 P.2d 572] (1977).

Yielding to the admonition of that paragraph, *Duff* has been revisited, but only after searching our majority opinion to

ascertain what use we there made of it—a search in vain. The first noteworthy aspect of *Duff* is that it was a unanimous opinion, and a second prime attribute is that it was authored by the same justice whose persuasion or writing style in this case has produced an opinion for the Court that a farm sprinkling system automatically became part of the realty on which it was installed to sprinkle. When I read in *Duff* that we unanimously held otherwise, I blush in mortification. Compounding the error in our ways, it further appears that we applied *Beebe v. Pioneer Bank & Trust Co.*, 34 Idaho 385, 201 P. 717 (1921) to go one way, but, a few years later, we now apply the same case to go another. This flagrant insult to the science of jurisprudence causes me to repeat an appropriate statement made by an attorney who shall go unnamed:

> The most intolerable evil, however, under which we have lived for the past twenty-five years, has been the changing and shifting character of our judicial decisions, by which we have been deprived of the inestimable benefit of judicial precedents as a safeguard to our rights of person and property.

The trial court's findings in *Duff, supra,* excerpted directly from the Clerk's Record, were succinct, not elaborate:

> In the late spring of 1968 Goff contacted defendant Draper who was in the irrigation equipment business. The purpose was *to obtain a sprinkler irrigation system for his lands which had been renovated from gravity irrigation to sprinkler irrigation.*
>
> ....
>
> The pump was attached to a fixture by bolts, and the outlet pipe was attached to the pump by bolts. The lateral lines and their component parts were portable. None of the equipment in question was sufficiently attached to the land as to become a part of it and thereby lose its character as personalty. The equipment was not specifically designed for Goff's land but could be used on other land and could be obtained by sample or catalog

number. R., pp. 111–12 (emphasis added).

Scanty as those findings were, they were the findings of the trier of fact, they were adequate, and were upheld in an equally scanty Supreme Court opinion:

> The equipment in question consisted of an irrigation pump and "hand" or "lateral" irrigation lines. The pump sat on a concrete foundation embedded in the ground. It was attached to the foundation by bolts and could be removed from it by loosening the bolts and by removing its coupling with an irrigation line. The "hand" or "lateral" lines were above ground lines which could be removed from the property by uncoupling them from the sub-surface lines which supplied water to them. Given these facts, *there was evidence from which the district court could conclude that these pieces of equipment were not fixtures attached to the realty* and had retained their character as personalty and we uphold that finding. *See Beebe v. Pioneer Bank & Trust Co.*, 34 Idaho 385, 201 P. 717 (1921); *Boise-Payette Lumber Co. v. McCornick*, 32 Idaho 462, 186 P. 252 (1919). *Cf.* I.C. § 55–101; I.C. § 28–9–313. *Duff, supra,* [98 Idaho] at 381–82, 565 P.2d at 574–75 (emphasis added).

In holding that the irrigation system was personalty, the Court ruled against a strong argument made by the brief of the land owner's trustee in bankruptcy, the argument of which was largely predicated upon *Beebe,* and its three tests. The trial court judgment which the Court reverses today is virtually indistinguishable from *Duff, supra.* To say that is not to say that the Court's opinions in the two cases are not readily distinguishable. In *Duff* the factual findings of the trial court were set forth for public view, and declared to substantiate the ultimate factual finding that the sprinkling system was and remained personalty.

In this case the Court's opinion states at *one* place that the trial court found "that the irrigation systyem was not a fixture"—and nothing more at that point—implying

or at least leaving the impression that the trial judge was totally unaware of the *Duff* case—which less than six years earlier had been decided by another district judge in the same district.[1]

The findings of the trial court here are found to go beyond the extent implied by the majority. There were some additional findings which, in addition to knowing the law as previously announced by this Court, obviously influenced the trial court's ultimate findings. Perhaps, in this extremely complicated case, it would be well to isolate the findings pertinent to the irrigation sprinkling system:

1. Shull Enterprises, Inc., is a closely-held family corporation owned by the children, grandchildren and great-grandchild of Nora Rayl, Bill Rayl is a grandchild of Nora Rayl and the son of Laura Lee Rayl Smith. Both Bill Rayl and Jack R. Smith are stockholders of Shull Enterprises, Inc.

2. On February 9, 1970, Rayle entered into a written farm lease on the property involved in this lawsuit, which will be referred to as the "Hollister Farm", with the said written lease to run from the 9th day of February, 1970, until the 31st day of December, 1974....

5. Rayl admitted that he was served with a written notice terminating his lease on January 6, 1981, and that he was served on January 12, 1981, with a second written notice to vacate the premises on February 15, 1981 (Exhibit 26).

. . . .

16. The parties bought the first pivot sprinkling system in 1974. It was agreed that the parties would pay in the same proportion as they received the income, Rayl two-thirds, Shull one-third. The same division was used on the 1976 pivot.

17. Although the parties had always recognized the interest of each in the two pivot systems, they never set up a system for reimbursement or for depreciation.

20. After Shull determined in November, 1980, not to renew Rayl's lease, the directors agreed that Shull should buy out Rayl's two-thirds interest in the pivot systems. However, as referred to in Finding 19, they didn't know what the values were. The net result was that when Rayl was ordered with his property to vacate the premises he still owned two-thirds of the two pivot systems. R., pp. 58–62.

Where the two purchasers of the systems, Bill Rayl and Shull Enterprises, are in absolute agreement that after installation they own the systems together—which systems are located on corporate realty—this in and of itself would seem to conclusively establish a lack of any intent on the part of the two participants that the installation was intended as a permanent annexation. I had always thought that on an annexation of personalty to realty, the owner of the fee in the realty became *eo instante* the owner of that which was annexed—all one property. The ultimate finding of fact, which, as I mention from time to time, is often called a conclusion of law, was so here called by the trial court, and was:

1. The pivot irrigation systems complete were not fixtures legally attached to the realty and instead had retained their character of personalty.

Predicated on that ultimate fact, the trial court proceeded in Conclusion of Law No. 2 to add that, "The removal of the sprinkler systems by Rayl was justified and lawful and did not constitute either conversion or waste."

In *Shull's* post-judgment motion to amend the findings and conclusions, Shull sought the removal of Conclusions 1 and 2 above, and requested a substitution as follows:

---

1. The majority gratuitously impugns the district court in saying that: "There is no indication that the trial court considered any of the three tests normally applied ...." Likewise, anyone reading *Duff v. Draper* can say there is no indi- cation that the Supreme Court considered any of the three *Beebe* "tests," which go wholly unmentioned in the Court's opinion. *Beebe* is mentioned, however.

1. The pivot irrigation system complete was a fixture legally attached to the realty.

2. The removal of the sprinkler system was not justified and did constitute waste.

The motion set forth no grounds or reasons for so altering Conclusion No. 1, which rather strongly suggests that all counsel were of a view that this Conclusion No. 1, more aptly a finding of ultimate fact, was, as in a trial to a jury, simply a factual determination.

In arguing the motion, counsel for Shull realized that the factual determination had been made, mildly expressed dissatisfaction with it, but did not suggest that evidence did not support it:

The second issue, of course, is the sprinkler; and that is a little more complex. And we are simply asking the court to consider a matter that we felt deserved consideration and a matter that proof really was offered on, although we, if the court remembers—I don't want to mislead the court. We in our trial and in our brief that was submitted after the trial took the position that there was a ·conversion of this property and that the sprinkler system was a fixture and part of the land. And *the court, of course, found that that was not the case and found that it was personal property and, I think, relied on a particular Idaho case that I am familiar with in that finding.* And while I really respectfully disagree with the findings at least with respect to the buried pipeline and those things that were set in cement and firmly fixed, *I am not arguing that point for now.*

What I am suggesting, however, is this, Your Honor, and that is that the court found that the value of that sprinkler system in place while owned by Bill Rayl two-thirds and my client one-third had a value of 36,100; that after its removal the value was 18,600. Well, that left the value lost in destroying that installation at 17,500. Now, the court knows that the proof was undisputed that the new systems cost $75,128; and the installation value of that was $28,-830. And our point is simply this, Your Honor: I think that it is—it was well demonstrated during the trial that, and not disputed, that when Mr. Rayl put on the sprinkler systems during the time he was in tenancy and when he paid two-thirds and the defendant—or our client one-third that he took out and literally destroyed all checks and all ditches and all means of irrigating that by gravity flow. And it was obvious that there was no intention then or at any time that that system would be removed.

And I might also call the court's attention to the notice that was sent to him notifying him of the termination of his tenancy which contained a statement to him that our client, Shull Enterprises, was prepared to pay for his interest in that sprinkler system. And frankly, and I think there was testimony to the effect that they were prepared to pay $40,000, which was substantially more than the system was worth. But we recognized too that by his taking it off we had to replace it, and it was going to be even more expensive than that. But in disregard with that and with no opportunity to even discuss that, he just ripped it out.

And what we are suggesting that the court—if the court finds that it is personal property, which you have, that the proper way to value the damage to Shull would be to look at the cost of installation as well that they had to incur as a result of what we think is an improper and an unjustified act in digging up that main line and tearing out those installations. And what the arithmetic we went through is that the cost of that installation was $28,230; that Rayl owned two-thirds of the 17,500, which was the installation value of the system he removed, just using the arithmetic, the value after—or before removed less the value after removed gives you what the installation costs would be. And then giving him credit for that, which would be $11,-666.67, and that the net cost of replacement, then, of that installation would be

$17,163.33. And then suggest, then, taking the value of the pivots after removed and considering that Rayl—or that Shull Enterprises had a one-third interest in that, which would be $6200, using the 18,600 value after removal, and you add the two together and you come, for a total damage on that of $23,366.33.

And I simply respectfully submit, Your Honor, that this would put our client more nearly in the position he should have occupied; but to give him less than that and apply—and totally disregard the cost of installation and the fact that it was not intended that those be removed leaves our client through no fault of its own in a position of suffering damage that he is not—or it is not being compensated for.

Now, again, I have set this forth in our motion, Your Honor, and also in our brief; and we have also done the calculations in those. And I would respectfully request, Your Honor, that the court give consideration to that approach, which doesn't do damage and it doesn't question the decision the court made as treating it as personal property.

There is in my mind a large question as to whether counsel can move the court to substitute one conclusion for another (one ultimate fact for another), and then, after abandoning the proposition in argument before the trial court, then raise *and argue* it for the first time on appeal. That is precisely what has happened. But it would also seem to be unneedful of determination where, as here, the evidence, albeit it may have been capable of one or more interpretations, does support the findings of the true finder of facts—a truism often declared and applied by Justice Bakes, and by him applied in *Duff v. Draper*, with four justices joining his opinion.

Returning to my distinctions between the facts of this case and *Duff v. Draper*, in the latter the owner of the land had no investment in the sprinkling system. Here, if I have it correctly, from the majority opinion, Shull Enterprises owned ⅓ of the sprinkling system, and Bill Rayl was one of the corporate stockholders—all of whom were related. Bill Rayl owned ⅔ of the sprinkling system—outright. That division of purchase price flowed from the ⅓–⅔ share cropping lease.

The ownership is conceded, and equally conceded is the fact that Shull Enterprises full well recognized that they were obligated to pay for Bill Rayl's two-thirds ownership if they wanted to keep the system. But Shull did not do it, and as one of two parties owning personally as tenants-in-common, and having the larger interest, Bill Rayl took the system with him when his lease was up after the family corporation obtained an eviction order against him. Most, if not all, share-cropping tenants take their equipment with them when they leave. Nothing in the record supports any contention that the two systems would not work on two other parcels of land capable of being sprinkler irrigated.

Moreover, counsel for Shull, with commendable candor, in telling us at oral argument on rehearing that our first opinion was a proper application of the *Beebe* test, third criterion, i.e. purpose, added, *"That's not to say that they couldn't be removed and installed somewhere else for the same purpose."* That counsel went on to add, "But the fact of the matter is they were purchased for use on this particular property," adds or subtracts nothing.

After all, Bill Rayl was a tenant. A decision was made just as it was in *Duff v. Draper* to move away from gravity irrigation to pump-powered sprinkling. In this case, moreover, the landlord, Shull, participated in this decision, a decision involving a large amount of money. Moreover, Shull recognized its obligation to purchase Rayl's ownership interest if Shull wanted to keep it. Bear in mind that under the law of fixtures, if annexation be the sole or main concern, under the majority view Shull as owner of the real property, automatically became the owner of the sprinkling system. Yet Shull conceded otherwise, throwing a vast illumination on the question of intent.

It is true, as counsel for Shull argued, that the systems that were purchased and

installed were designed and sufficient for the particular lands Rayl was farming as share-cropper. Of course they were. It is seriously doubted that Rayl or any one else in his right mind could involve himself and his landlord in acquiring a system for some other farm. Nor would the average farmer purchase a system too large, or one too small, for the particular job.

Basically what the trial bench and bar will see here is that an esteemed trial judge faithfully applied this Court's views espoused in *Duff v. Draper*, only to find himself reversed by reason of having done so. That the trial court applied *Duff v. Draper* is apparent from the remarks of counsel for Shull at arguing the motion to alter the findings and conclusions. Moreover, after not deigning the opportunity to distinguish for the trial court the facts of this case from *Duff v. Draper*, counsel for Shull reserved that effort for this Court. The distinction drawn, while it may or may not have convinced the majority, at least engendered enough energy to ignore the trial court findings and fabricate a new set. At any rate, the effort at distinction was made, but it does not appear in the Court's opinion, as equally glaring as no mention of *Duff v. Draper*. The distinction, beginning at page 48 of appellant's brief, is this:

> The irrigation system in *Duff v. Draper*, 98 Idaho 379, 565 P.2d 572 (1977), was somewhat different from the system in the case at bar. The system in the *Duff* case consisted of a pump bolted to a pad, a buried or sub-surface main line and hand lines or lateral lines which were merely coupled into the main line. The hand lines were not bolted onto the main line nor were they operated by a series of electrical switches and motors. The pivot system in the case at bar consisted of the pump, and electrical panel, buried main lines, buried electrical lines from the electrical panel which operated the switches and motors that activated the panels and connected to the electric switch panel by the buried electrical lines as well as the buried main lines. In the *Duff* case, the land was irrigated by uncoupling the hand lines and moving them

> by hand to a new location each set. In the case at bar, the pivot was not unbolted or uncoupled at all. The electric switches were activated and the electricity went through the buried electrical lines to activate the pivot system which then moved around in a circle to irrigate the land. In the *Duff* case, the hand lines, which were designed to be uncoupled by hand for easy movement, were removed and the pump was removed. *The buried main line was left intact.* There was no buried electrical lines connecting the hand lines to any electrical panel, nor were the hand lines bolted down. The system could not be treated as one unit, as it should be in this case.

> . . . .

> It should be noted that this court did not hold that a pump which is bolted down could not be a fixture. It merely held that under the facts of that particular case, evidence introduced supported the district court's finding that the pump had not become a fixture.

(Appellant's Brief, pp. 49–50).

Where this Court designedly did not adopt Shull's distinguishing of this case from *Duff v. Draper*, then at the least, as a matter of downward judicial courtesy, it should at least explain to the district court the manner in which *Duff v. Draper* was misapplied. Instead, so it would seem, it was easier to factually redecide the case. Even that endeavor was not well done. Whereas clearly stated findings of fact are required of lower courts, that rule apparently has no application where the findings are made at this level.

For the most part, the redetermination of facts was not done by "findings," but rather by "indications." Hence, "various officers of the corporation *indicated* that the corporation intended to pay Rayl for his contribution (not share of ownership) to the system...." "Other testimony *indicated* the possibility that the corporation had chosen not to conduct a cost reimbursement program ..." And, importantly, and an outrage to the district judge, "There is *no*

*indication* that the trial court considered any of the three tests normally applied in situations such as these to determine whether a particular object had become a fixture."

Having established by indication, or lack thereof, the true facts of the matter, the majority opinion declares that: *"This case is one of that type wherein the facts are so clear that only one result could be reached;* thus we can determine as a matter of law that the irrigation system under consideration here was a fixture." In getting to "that type of case" the majority necessarily is obliged to ignore the intentions of the parties in purchasing and installing the system. This is handled nicely by resorting to *Beebe,* and as it quoted from *Boise-Payette Lumber Co. v. McCormick,* by striking therefrom the word "strictly." *Beebe* is thus made to read: "The inquiry is not as to the intention of the person himself who annexed the chattel to the freehold ...."

The striking of the word "strictly" is necessary to the majority's rationale on its factual redetermination, but it is a disservice to the parties and does little to enhance any esteem for the Court. In this case the installation was made by the two identities who purchased the system, and by both, or by the major owner with the other's full consent and knowledge. Only by striking the word "strictly" does the majority

achieve the goal of substituting its own findings for those of the trial court. Intent of the installers of personal property is a large factor in making the factual determination as to whether or not an annexation took place.

The Court in *Beebe* stated that the third criterion *was* the "Intention of the party making the annexation to make the article a permanent accession to the freehold—this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made." *Id.,* 34 Idaho at 391, 201 P. 717. The Court went on to add, continuing to quote from the early Ohio case, that "the intention with which an article was annexed the consideration of paramount importance, *id.* at 391, 201 P. 717, and then declared the first two tests as "mainly important as evidence of intention." *Id.* at 391, 201 P. 717.

What the *Boise-Payette Lumber Co.* case actually said, at p. 392, 201 P. 717, was considerably different than as editorially excerpted and set out in the majority opinion. In that case, where the contest was between an attaching creditor and a mortgagee, on the left is what the Court's opinion quoted, and opposite it the majority's version:

| | |
|---|---|
| "[T]he inquiry is not strictly as to the intention of the person himself who annexed the chattel to the freehold. . . . The inquiry is as to what intention must be imputed to him in the light of all the circumstances, when tested by the common understanding of those familiar with the subject." | "Except in cases where, by contract or agreement, the intention of the party who made the annexation determines the character of the article or machine as to whether it is a chattel or a fixture, the inquiry is not strictly as to the intention of the person himself who annexed the chattel to the freehold. Thus, in the case at bar the contest is between an attaching creditor and a mortgagee. Neither party was bound by the intention existing in the mind of the owner. The inquiry is as to what intention must be imputed to him in the light of all the circumstances, when tested by the common understanding of those familiar with the subject . . . ." |
| Majority Opinion, p. 572 | *Beebe, supra,* at 392, 201 P. at 719. |

The portion omitted by the majority is: "Neither party was bound by the intention existing in the mind of the owner." The quote in the majority opinion, as editorialized, makes the inquiry to "what intention must be imputed to him in the light of ..." referenced back to the annexer, whereas the full text reads very clearly that: "The inquiry is as to what intention must be imputed to him (the owner) in light of all the circumstances, when tested by the common understanding of those familiar with the subject." All of which had to do with a creditor and a mortgagee who had nothing to do with the annexation, and a far cry from this case where the systems were bought as commonly owned property, and the involved parties were not strangers dealing at arms-length, but on the contrary had very good opportunity each to know the mind of the other as they together spent a great deal of money which went into systems to be used by the tenant Rayl who was at the time in possession of the farm only by virtue of carry-over statutory provisions after his lease ran out.

If this Court is to make amends, far better to set this case down for a third reargument than to stand on the present majority opinion. Such would encompass one hour of this Court's time, which though an inconvenience, would be far better than leaving this area of the law in a shambles. I close this effort as I opened it:

> What the opinion of this Court basically comes down to is that every irrigation system installed upon a farm becomes a "fixture." In Idaho we no longer consider the relationship of the claiming parties, the relative difficulty of removal, or the nature of the article annexed .... Nor do we consider the previous rulings of this Court. See, *Duff v. Draper*, 98 Idaho 379 [565 P.2d 572] (1977).