## THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 41993

LIBERTY BANKERS LIFE INSURANCE
COMPANY, an Oklahoma insurance
company,

    Plaintiff-Appellant,

v.

WITHERSPOON, KELLEY,
DAVENPORT & TOOLE, P.S., a
Washington corporation,

    Defendant-Respondent,

and

THE POINT AT POST FALLS, LLC, an
Idaho limited liability company; POST
FALLS LANDING MARINA, LLC, an
Idaho limited liability company; and JOHN
and JANE DOES 1-100,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, August, 2015 Term

2016 Opinion No. 2

Filed: January 6, 2016

Stephen W. Kenyon, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Hon. Benjamin R. Simpson, District Judge.

The summary judgment ruling of the district court with regard to judicial estoppel is vacated, the judgment of the district court with regard to respondent's first priority security interest is hereby vacated and the district court's judgment with regard to the Marina is vacated. This case is remanded for further proceedings consistent with the Opinion.

Stoel Rives, LLP, Boise, and Lukins & Annis, P.C., Coeur d'Alene, attorneys for appellant. Christopher Pooser argued.

John F. Magnuson, Coeur d'Alene, attorney for respondent.

<hr>

W. JONES, Justice

# I. NATURE OF THE CASE

This appeal involves the competing security interests of Liberty Bankers Life Insurance Company ("Liberty" or "Appellant") and Witherspoon, Kelley, Davenport, & Toole, P.S. ("Witherspoon" or "Respondent") in certain real and personal property located in Post Falls, Idaho ("Post Falls Landing" and the "Marina" respectively), which were formerly owned by the Point at Post Falls, LLC and Post Falls Landing Marina, LLC (collectively, "The Point").

# II. FACTUAL AND PROCEDURAL BACKGROUND

In September of 2001, The Point, a business entity associated with Harry A. Green, purchased thirty-four acres of real property in Post Falls, Idaho. Witherspoon provided legal representation to The Point during the purchase. In September of 2004, to secure payment of legal fees and costs, The Point granted Witherspoon a promissory note in the principal amount of $164,171.85 ("Witherspoon's Original Promissory Note"). Witherspoon's Original Promissory Note was secured by a deed of trust to Post Falls Landing ("Witherspoon's Original Deed of Trust"). Witherspoon's Original Deed of Trust was recorded on October 4, 2004, in Kootenai County.

On August 26, 2005, Liberty and The Point entered into an agreement (the "Original Loan Agreement") by which Liberty would loan $3,934,390 to The Point in exchange for a promissory note in the amount of the loan ("Liberty's Original Promissory Note"), which was secured by a deed of trust to Post Falls Landing ("Liberty's Original Deed of Trust"). Liberty's Original Deed of Trust provides that "[n]o release of the conveyance [of the Post Falls property], or of the lien, security interest or assignment created and evidenced hereby, shall be valid unless executed by Beneficiary."

As a condition to the Original Loan Agreement, Witherspoon entered into an agreement subordinating Witherspoon's Original Deed of Trust to Liberty's Original Deed of Trust (the "Original Subordination Agreement"). The Original Subordination Agreement stated that "[Liberty's Original Deed of Trust] *and any renewals or extensions thereof*, shall unconditionally be and remain at all time [sic] a lien or charge on [Post Falls Landing], prior and superior to the lien or charge of [Witherspoon's Original Deed of Trust]." (emphasis added). The Original Subordination Agreement was recorded on August 26, 2005.

2

Thereafter, Liberty subsequently modified its loan agreement with The Point six times. Witherspoon executed additional subordination agreements in conjunction with each of these loan modifications.

On August 30, 2006, and December 11, 2006, Liberty agreed to extend additional funds to The Point. These funds were used to construct the Marina. The Marina consists of 142 boat slips, a floating convenience store, and fuel pumps. The Point began operating the Marina in the summer of 2008.

On or around April 30, 2010, Liberty and The Point entered into a seventh modification of their loan agreement (the "Seventh LMA"). Under the Seventh LMA, the parties agreed to increase the outstanding principal balance of Liberty's Original Promissory Note from $6,786,108.10 to $9,290,000.00 and to extend its maturity date to June 30, 2011. Like all of the previous loan modifications, the Seventh LMA was secured by Liberty's Original Deed of Trust. The Seventh LMA was recorded on September 3, 2010.

On August 6, 2010, Witherspoon entered into the third modification of Witherspoon's Original Deed of Trust. This modification granted Witherspoon a security interest in the Marina and its improvements, including any rents, income, profits, insurance proceeds, and accounts receivable. On September 7, 2010, Witherspoon perfected its security interest in the Marina by filing a UCC financing statement.

On August 10, 2010, Witherspoon entered into a final amended subordination agreement with The Point (the "Final Subordination Agreement"). The Final Subordination Agreement stated that "[Liberty's original Deed of Trust] shall unconditionally be and remain at all time [sic] a lien or charge on [Post Falls Landing], prior and superior to the lien or charge of [Witherspoon's Original Deed of Trust]." Unlike the prior subordination agreements, the Final Subordination Agreement did not include the "and any renewals or extensions thereof" language. The Final Subordination Agreement was recorded on September 3, 2010.

On June 30, 2011, Liberty's Original Promissory Note—secured by Liberty's Original Deed of Trust—matured. On August 12, 2011, Liberty directed the successor trustee of Liberty's Original Deed of Trust to foreclose on Post Falls Landing. On August 18, 2011, the successor trustee recorded a notice of default.

In September of 2011, Liberty and The Point entered into an eighth modification of their loan agreement (the "Eighth LMA"). Under the terms of the Eighth LMA, Liberty agreed to

3

reduce the amount of Liberty's Original Promissory Note to $6,744,156.69 and to execute a release of Blocks A, D, and E of the Post Fall Landing property from Liberty's Original Deed of Trust (the "Partial Release of Lien"). The Point, in turn agreed to issue a new promissory note in the amount of $2,545,843.31 ("Liberty's New Promissory Note"), which would be secured by a new deed of trust ("Liberty's New Deed of Trust") on Blocks A, D, and E. This would have the effect of dividing Liberty's $9.29 million dollar loan to The Point into two separate loans (a construction loan and a non-construction loan).[1]

In this respect, the Eighth LMA stated:

> 23. The Loan and indebtedness evidenced by [Liberty's Original Promissory Note] shall continue to be secured by [Liberty's Original Deed of Trust] encumbering [Post Falls Landing]. . . .
> 24. Contemporaneously with the execution of this Agreement, [The Point] is executing construction and development loan documents evidenced by [Liberty's New Promissory Note] in the original principal amount of $2,545,843.31, payable to [Liberty] . . . , secured by, among other things, a deed of trust encumbering [Blocks A, D, and E]. . . . Since [Blocks A, D, and E are] part of [Post Falls Landing], Lender shall execute a Partial Release of Lien to release of [Blocks A, D, and E] from [Liberty's Original Deed of Trust] securing [Liberty's Original Promissory Note] modified by this agreement in exchange for a principal payment of $750,000.00 which shall be advanced by Lender under the $2,545,843.31 Promissory Note.

Liberty and The Point both executed the Eighth LMA, but it was never recorded. The Point executed Liberty's New Promissory Note and Liberty's New Deed of Trust, which also were never recorded. Liberty never executed the Partial Release of Lien.

On December 19, 2011, The Point filed for bankruptcy, which automatically stayed the trustee's sale of the Point at Post Falls. On December 20, 2011, Liberty filed suit against Green, individually as a guarantor, to recover the debt owed to Liberty. *Liberty v. Green*, Kootenai County Case No. CV-11-10121.

On April 18, 2012, Liberty filed a proof of claim in The Point's first bankruptcy proceeding and attached the Eighth LMA in support of its claim. In Liberty's motion for relief from the automatic stay, filed July 12, 2012, Liberty stated that "On September 8, 2010, the parties agreed to and executed an Eighth Loan Modification Agreement . . . ."

---

[1] The separation of the loan into construction and non-construction components was performed in accordance with a September 26, 2007, Consent Order between Liberty and the State of Florida Officer of Insurance Regulation.

On September 6, 2012, the Point's bankruptcy proceeding was dismissed. The trustee rescheduled the foreclosure sale, which was pursued in accordance with the Seventh LMA, for October 8, 2012.

As the date of the foreclosure sale approached, The Point moved to intervene in *Liberty v. Green* and enjoin the sale. In a memorandum decision and order, filed October 4, 2012, the district court granted both motions, but conditioned the injunction of the foreclosure sale on The Point posting an $875,000 bond. The district court acknowledged in its order that there was a substantial likelihood that the Eighth LMA, rather than the Seventh LMA, would govern the foreclosure. The Point did not post the bond required to enjoin the trustee's sale.

On October 17, 2012, Witherspoon sent a letter to the trustee asserting its first priority security interest on the Marina. In the letter, Witherspoon acknowledged that: "We understand that, if completed, the effect of the Foreclosure Sale will be elimination of our second priority lien against [Post Falls Landing]."

The trustee's sale took place on November 14, 2012, which resulted in the conveyance of the real property of Post Falls Landing, including Blocks A, D, and E, to Liberty in exchange for a credit bid of $3,404,000.00.

On February 5, 2013, Liberty filed an action against Witherspoon seeking a judicial declaration that the Marina was a fixture on Post Falls Landing real property, a judicial declaration that the trustee's deed conveyed to Liberty all interest in the Marina, and entry of a decree quieting title to the Marina in Liberty's name. Witherspoon answered and filed counterclaims seeking declaratory relief that: (1) Liberty's Original Deed of Trust had been null and void at the time of the foreclosure sale for failing to comply with the terms of the Eighth LMA; (2) the foreclosure sale had failed to comply with the terms of the Eighth LMA; (3) Witherspoon did not subordinate any security interest or rights with respect to the Eighth LMA; (4) Liberty was estopped from denying the enforceability of the Eighth LMA; (5) Witherspoon has a prior and perfected security interest in the Marina under the Final Subordination Agreement and its UCC filing; (6) Liberty has no right, title, interest or claim in or to the Marina; and (7) Liberty's deeds of trust were procured in violation of Idaho law through fraudulent or deceptive means. Witherspoon also filed claims of breach of contract, conversion, and slander.

On September 10, 2013, Witherspoon moved for partial summary judgment. On October 15, 2013, the district court issued a memorandum decision and order granting in part and

denying in part Witherspoon's motion. The district court ruled that Liberty was judicially estopped from denying the enforceability of the Eighth LMA due to its previous representations in bankruptcy court and in *Liberty v. Green*. The district court found genuine issues of material fact as to each of the other issues.

Following a two-day bench trial, the district court held that the Final Subordination Agreement did not apply to any renewals, extensions, or modifications of Liberty's Original Deed of Trust—a category that includes Liberty's New Deed of Trust. Accordingly, the court reasoned that Witherspoon's Original Deed of Trust was not subordinate to Liberty's New Deed of Trust. Under the terms of the Eighth LMA, Blocks A, D, and E of Post Falls Landing were only going to secure Liberty's New Deed of Trust (and were to be released from Liberty's Old Deed of Trust). The court reasoned, therefore, that Witherspoon held first priority to those blocks at the time of the sale.

Having determined that Witherspoon had first priority to Blocks A, D, and E of Post Falls Landing at the time of the sale, the court concluded that Liberty had unintentionally purchased those blocks subject to Witherspoon's first priority interest. As to the Marina, the district court determined that it was personal property to which Witherspoon retained a first priority interest. The district court further determined that Witherspoon's claim that it was an intended beneficiary of the Eighth LMA was moot due to the court's other findings.

On January 22, 2014, Liberty moved for reconsideration. Specifically, Liberty asked the district court to reconsider: (1) whether the Marina was a fixture or personal property; (2) the scope and effect of Witherspoon's subordination agreements; (3) the legal effect of the Eighth LMA on Liberty's security interest in Post Falls Landing; and (4) whether Witherspoon was barred under the doctrine of laches from pursuing its causes of action against Liberty.

On February 27, 2014, the district court issued an order denying Liberty's motion. It noted that Bradford Phillips, Liberty's CEO and President, had taken inconsistent positions on whether the Seventh or Eighth LMA was the binding agreement. Furthermore, though Liberty had argued that it had never received the original documents from Green, which would have been necessary to foreclose under the Eighth LMA, Green had testified to the contrary. The district court found Green's testimony to be credible and Phillips's testimony to lack credibility, reasoning that while Phillips had a "large stake in the outcome of this case," Green had "nothing to lose" by returning the original documents and had "no stake in the outcome." Indeed, even if it

had not received them, "Liberty could have compelled Mr. Green to produce such documents but chose not to do so."

On March 12, 2014, the district court issued a final judgment and decree quieting title to Post Falls Landing to Liberty, subject to Witherspoon's first priority interest on Blocks A, D, and E. The district court also ruled that Witherspoon had a perfected first priority security interest in the Marina. On March 21, 2014, Liberty filed a notice of appeal.

## III. ISSUES ON APPEAL

1. Whether the district court abused its discretion in finding that judicial estoppel barred Liberty from contesting the enforceability of the Eighth LMA.

2. Whether Liberty's entry into the Eighth LMA, Liberty's New Promissory Note, or Liberty's New Deed of Trust had the effect of releasing Blocks A, D, and E from Liberty's Original Deed of Trust.

3. Whether Liberty's non-judicial foreclosure was void for failing to comply with Idaho law.

4. Whether Witherspoon could move to enforce the Eighth LMA as a third party beneficiary.

5. Whether the district court erred by ruling that the Marina was personal property.

## IV. STANDARD OF REVIEW

### A. Summary Judgment

On appeal from the grant of a motion for summary judgment, this Court utilizes the same standard of review used by the district court originally ruling on the motion. Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). When considering whether the evidence in the record shows that there is no genuine issue of material fact, the trial court must liberally construe the facts, and draw all reasonable inferences, in favor of the nonmoving party.

*Golub v. Kirk-Hughes Dev., LLC*, 158 Idaho 73, 75–76, 343 P.3d 1080, 1082–83 (2015) (quoting *Conner v. Hodges*, 157 Idaho 19, 23, 333 P.3d 130, 134 (2014)).

When an action, as here, will be tried before the court without a jury, the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences. Resolution of the possible conflict between the inferences is within the responsibilities of the fact finder. This Court exercises free review over the entire record that was before the district judge to determine whether either side was entitled to judgment as a matter of law and reviews the inferences drawn by the district judge to determine whether the record reasonably supports those inferences.

7

*Big Wood Ranch, LLC v. Water Users' Ass'n of Broadford Slough & Rockwell Bypass Lateral Ditches, Inc.*, 158 Idaho 225, 229, 345 P.3d 1015, 1019 (2015) (quoting *P.O. Ventures, Inc. v. Loucks Family Irrevocable Tr.*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007)).

**B.      Bench Trial**

   Review of a trial court's conclusions following a bench trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. Since it is the province of the trial court to weigh conflicting evidence and testimony and to judge the credibility of witnesses, this Court will liberally construe the trial court's findings of fact in favor of the judgment entered. This Court will not set aside a trial court's findings of fact unless the findings are clearly erroneous. If the trial court based its findings on substantial evidence, even if the evidence is conflicting, this Court will not overturn those findings on appeal. Additionally, this Court will not substitute its view of the facts for that of the trial court. This Court exercises free review over matters of law.

*Id.* at 230, 345 P.3d at 1020 (citations omitted).

**C.      Motion to Reconsider**

   When a district court decides a motion to reconsider, "the district court must apply the same standard of review that the court applied when deciding the original order that is being reconsidered." *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). If the original order was within the trial court's discretion, then so is the decision to grant or deny the motion to reconsider. *Id.* When we review a trial court's decision to grant or deny a motion for reconsideration, we use the same standard of review the lower court used in deciding the motion for reconsideration. *Id.*

*Westby v. Schaefer*, 157 Idaho 616, 621, 338 P.3d 1220, 1225 (2014).

**V. ANALYSIS**

   Liberty's appeal challenges five rulings by the district court, one at the summary judgment stage and four after the bench trial. The single issue from the summary judgment stage is whether the district court properly invoked judicial estoppel against Liberty. Of the four bench trial issues, three involve Liberty's and Witherspoon's competing security interests in Post Falls Landing and the effect of the Eighth LMA on those interests. The fifth and final issue is whether the Marina is personal property or a real property fixture to Post Falls Landing. Each issue will be addressed in turn below. Ultimately, the judgments of the district court are vacated and the case is remanded for further proceedings.

**A.      The district court abused its discretion in finding that judicial estoppel barred Liberty from contesting the enforceability of the Eighth LMA.**

"The doctrine of judicial estoppel was adopted by this Court in *Loomis v. Church*, 76 Idaho 87, 277 P.2d 561 (1954)." *Sadid v. Idaho State Univ.*, 154 Idaho 88, 96, 294 P.3d 1100, 1108 (2013). There, this Court stated:

> It is quite generally held that where a litigant, by means of such sworn statements, obtains a judgment, advantage or consideration from one party, he will not thereafter, by repudiating such allegations and by means of inconsistent and contrary allegations or testimony, be permitted to obtain a recovery or a right against another party, arising out of the same transaction or subject matter.

*Loomis v. Church*, 76 Idaho at 93–94, 277 P.2d at 565; *see also, Doe v. Doe*, 158 Idaho 614, 617, 349 P.3d 1205, 1208 (2015). In short, "[j]udicial estoppel precludes a party from advantageously taking one position, then subsequently seeking a second position that is incompatible with the first." *Id.* (quoting *McCallister v. Dixon*, 154 Idaho 891, 894, 303 P.3d 578, 581 (2013)).[2] "The doctrine of judicial estoppel sounds in equity and is invoked at the discretion of the court." *McCallister*, 154 Idaho at 894, 303 P.3d at 581.

In this case, at the summary judgment stage, the district court ruled that Liberty was "estopped from denying the enforceability of the Eighth [LMA]." The district court primarily based this conclusion on Phillips's testimony that: "I view the loan, the Eighth Modification Agreement, as a binding agreement." In addition, the district court noted that Liberty was "on notice" via the decision in *Liberty v. Green* that the Eighth LMA "was likely the enforceable agreement," and that Liberty had "made representations regarding the Eighth [LMA]" in its motion for relief from the automatic stay in The Point's bankruptcy proceedings.

Liberty argues on appeal that the district court abused its discretion to invoke judicial estoppel. First, Liberty contends that the district court failed to recognize the distinction between a "binding" agreement and an "enforceable" one. Liberty submits that it has consistently maintained the position that the Eighth LMA was binding, but not enforceable, because while the Eighth LMA was properly entered into by the relevant parties, the terms of the agreement were not performed—Liberty's New Deed of Trust with respect to Blocks A, D, and E and the Partial Release of Lien were never provided as required by the Eighth LMA. Second, Liberty argues that the district court failed to find that Liberty obtained a judgment, advantage, or consideration,

---

[2] "The policy behind judicial estoppel is to protect 'the integrity of the judicial system, by protecting the orderly administration of justice and having regard for the dignity of the judicial proceeding.'" *Hoagland v. Ada Cty.*, 154 Idaho 900, 912, 303 P.3d 587, 599 (2013) (quoting *A & J Constr. Co. v. Wood*, 141 Idaho 682, 685, 116 P.3d 12, 16 (2005)).

from any assertion that the Eighth LMA was binding. Third, Liberty highlights that for an advantage to be considered, it must have been gained in an actual judicial proceeding.

Witherspoon submits that the following facts show that Liberty has taken inconsistent positions: (1) Liberty advised the State of Florida that it entered into the Eighth LMA to comply with regulations before Liberty and The Point actually signed the Eighth LMA; (2) Liberty represented to The Point upon its default under the Seventh LMA that the execution of the Eighth LMA was necessary for Florida regulators; (3) Liberty confirmed the Eighth LMA with the State of Florida after the agreement's execution; (4) Liberty represented in *Liberty v. Green* that the Seventh LMA was the governing agreement; (5) Liberty's proof of claim in The Point's bankruptcy proceeding included the Eighth LMA; (6) Liberty's motion for relief from the automatic stay in The Point's bankruptcy proceeding represented that the Eighth LMA was the governing document; and (7) Phillips testified in *Liberty v. Green* that the Eighth LMA was binding. Based on these facts, Witherspoon contends that Liberty has taken numerous incompatible positions by which it has gained two advantages: (1) Liberty's representations to the State of Florida regarding the Eighth LMA allowed Liberty to put its concerns with the State of Florida to rest: and (2) by representing in *Liberty v. Green* that the Seventh LMA governed, Liberty was able to move forward with the trustee's sale under the Seventh LMA as The Point was unable to post bond to enjoin the sale.

We find that the district court abused its discretion by invoking judicial estoppel because it failed to apply the appropriate legal standard. When reviewing a district court's discretionary decision, this Court inquires:

> (1) [W]hether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.

*McCallister*, 154 Idaho at 894, 303 P.3d at 581 (quoting *Riley v. W.R. Holdings, LLC*, 143 Idaho 116, 121, 138 P.3d 316, 321 (2006)). In this case, the district court did not apply the correct legal standard in finding judicial estoppel because it failed to find that Liberty had obtained "a judgment, advantage, or consideration" from its inconsistent position. *See Doe*, 158 Idaho at 617, 349 P.3d at 1208. The primary inconsistent position cited by the district court was Phillips's testimony that the Eighth LMA was "binding" in *Liberty v. Green*, which was in contrast to Liberty's contention in these proceedings that the Seventh LMA was the binding and enforceable

agreement. However, the district court failed to make any findings as to how this statement conferred an advantage to Liberty in that proceeding.

Furthermore, the "advantages" alleged by Witherspoon are not of the type that give rise to judicial estoppel. Witherspoon first claims that Liberty obtained an advantage with the State of Florida by representing to the State that the Eighth LMA had been executed. This benefit, however, is not directly connected to any sworn statement made by Liberty, and Liberty's interaction with the state of Florida was not through any judicial process. Judicial estoppel applies only to positions taken in relation to judicial proceedings. *See Sadid*, 154 Idaho at 96, 294 P.3d at 1108 (stating that judicial estoppel does not apply in administrative proceedings).

Witherspoon next claims that Liberty obtained an advantage by representing in *Liberty v. Green* that the Seventh LMA governed. This may be true, however the inconsistent position relied on by the district court was Phillips's testimony that the *Eighth* LMA was binding, not the Seventh LMA. Liberty's representation in *Liberty v. Green* that the Seventh LMA governed is actually consistent with its position in the current proceedings, and therefore cannot be the basis for judicial estoppel.

Accordingly, we hold that the district court erred by granting partial summary judgment to Witherspoon on the issue of judicial estoppel.

**B. The Eighth LMA did not have the effect of releasing Blocks A, D, and E from Liberty's Original Deed of Trust.**

The central issue before this Court is whether the execution of the Eighth LMA served to release Blocks A, D, and E from Liberty's Original Deed of Trust such that those blocks secured only Liberty's New Deed of Trust at the time of the foreclosure sale. This determination controls the priority of Liberty's and Witherspoon's respective security interests in those blocks, and whether Liberty was able to purchase them free and clear of encumbrances.

The district court made four relevant rulings on this issue. First, as a preliminary matter, the district court determined that Witherspoon never agreed to subordinate Witherspoon's Original Deed of Trust to Liberty's New Deed of Trust. Second, the district court found that, in accordance with Idaho Code section 45-108, entry into the Eighth LMA in and of itself had the effect of releasing Blocks A, D, and E from Liberty's Original Deed of Trust and securing those blocks under Liberty's New Deed of Trust. Third, the district court concluded that because entry into the Eighth LMA had the effect of releasing Blocks A, D, and E from Liberty's Original Deed of Trust, and because Witherspoon had not subordinated Witherspoon's Original Deed of

11

Trust to Liberty's New Deed of Trust, Witherspoon's Original Deed of Trust was "valid against and superior to all rights, liens and claims acquired by Liberty as to [Blocks A, D, and E.]" Finally, the district court determined that Liberty was authorized, as the holder of a junior interest in Blocks A, D, and E (under Liberty's New Deed of Trust) and a senior interest in the remainder of the property (under Liberty's Old Deed of Trust), to foreclose on the entire property; however, as the credit-bid purchaser, Liberty took the property subject to Witherspoon's senior security interest on Blocks A, D, and E.

For the following reasons, we hold that the district court erred in determining that Blocks A, D, and E had been released from Liberty's Original Deed of Trust and then sold subject to Witherspoon's Original Deed of Trust.

1. *The express language of the Eighth LMA did not release Blocks A, D, and E from Liberty's Original Deed of Trust.*

"This Court's 'primary objective when interpreting a contract is to discover the mutual intent of the parties at the time the contract is made.' The parties' intent should be ascertained from the contract's language." *Hap Taylor & Sons, Inc. v. Summerwind Partners, LLC*, 157 Idaho 600, 610, 338 P.3d 1204, 1214 (2014) (quoting *Straub v. Smith*, 145 Idaho 65, 69, 175 P.3d 754, 758 (2007)). "In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010) (quoting *C & G, Inc. v. Rule*, 135 Idaho 763, 765, 25 P.3d 76, 78 (2001)). "If the terms of a contract are clear and unambiguous, the interpretation of their meaning and legal effect are questions of law." *Opportunity, LLC v. Ossewarde*, 136 Idaho 602, 605, 38 P.3d 1258, 1261 (2002).

Here, the relevant language of the Eighth LMA contains clear and unambiguous terms that do not release Blocks A, D, and E from the original deed of trust. The Eighth LMA states in Paragraph 23 that "[t]he Loan and indebtedness evidenced by [Liberty's Original Promissory Note] shall continue to be secured by [Liberty's Original Deed of Trust] encumbering [Post Falls Landing]." The Eighth LMA states in Paragraph 24, that The Point "*is executing* construction and development loan documents evidenced by [Liberty's New Promissory Note] in the original principal amount of $2,545,843.31, payable to [Liberty] . . . . secured by, among other things, a deed of trust encumbering [Blocks A, D, and E]." (emphasis added). In contrast, Paragraph 24 also states that Liberty "*shall execute* a Partial Release of Lien to release of [Blocks A, D, and E]

12

from [Liberty's Original Deed of Trust] securing [Liberty's Original Promissory Note]." (emphasis added). These terms make it clear that it was not the Eighth LMA itself, but rather the additional documentation—specifically the Partial Release of Lien—that would serve to release Blocks A, D, and E from Liberty's Original Deed of Trust. The Eighth LMA merely served to memorialize the agreement of the parties to execute this additional documentation. Based on the evidence in the record, however, Liberty failed to fulfill its obligations in this regard. While the Point executed a new promissory note (Liberty's New Promissory Note) secured by a new deed of trust (Liberty's New Deed of Trust), Liberty did not execute the Partial Release of Lien, which would release Blocks A, D, and E from the Original Deed of Trust. Accordingly, even though the Eighth LMA is an enforceable contract, the district court erred by equating enforceability of the Eighth LMA with the performance of the obligations therein.

2. *Idaho Code section 45-108 does not apply to deeds of trust.*

Idaho Code section 45-108 provides that "[a] lien may be created by contract, to take immediate effect, as security for the performance of obligations not then in existence, which lien, if not invalid on other grounds, shall be valid as against all persons." I.C. § 45-108. The district court applied Idaho Code section 45-108, holding that the parties' entry into the Eighth LMA in and of itself served to create Liberty's New Deed of Trust and release Blocks A, D, and E from Liberty's Original Deed of Trust.

This was error. Idaho Code section 45-108 does not provide for the creation of deeds of trust. Idaho Code section 45-108 expressly provides for the creation of "liens." I.C. 45-108. Deeds of trust are not "liens" for the purposes of this statute. This is evident from Idaho Code section 45-101, which is part of the same chapter as Idaho Code section 45-108, wherein a lien is defined as "a charge imposed in some mode *other than by a transfer in trust* upon specific property by which it is made security for the performance of an act." I.C. § 45-101 (emphasis added). As stated by the Court in *Chavez v. Barrus*: "Under Idaho law, a lien is a charge upon property to secure payment of a debt and *transfers no title to the property subject to the lien*." 146 Idaho 212, 221, 192 P.3d 1036, 1045 (2008) (citing I.C. § 45-101) (emphasis added). In contrast to a lien, a deed of trust "convey[s] real property to a trustee in trust to secure the performance of an obligation of the grantor or other person named in the deed to a beneficiary." I.C. § 45-1502(3). When a deed of trust is executed and delivered, the legal title of the property passes to the trustee." *Sims v. ACI Nw., Inc.*, 157 Idaho 906, 911, 342 P.3d 618, 623 (2015)

13

(citations omitted) (quoting *ParkWest Homes, LLC v. Barnson*, 154 Idaho 678, 684, 302 P.3d 18, 24 (2013)). Accordingly, the lien priority rule in Idaho Code section 45-108 does not extend to deeds of trust.[3]

Second, Idaho Code section 45-108 does not apply because, as discussed above, the terms of the Eighth LMA did not seek to create a new security interest by contract to take immediate effect. The Eighth LMA established Liberty and The Point's agreement to engage in further action which included the creation of a new deed of trust. The agreement itself did not create Liberty's New Deed of Trust, which was drafted and signed by The Point at a later date. Likewise it did not serve to release Liberty's Original Deed of Trust with respect to Blocks A, D,

---

[3] Witherspoon suggests that *Brown v. Bryan*, 6 Idaho 1, 51 P. 995 (1898), stands for the proposition that deeds of trust are covered under Idaho Code section 45-108. In *Brown*, this Court explained that Idaho Code sections 45-101 and 45-108, along with other relevant statutes, served as:

> rules to govern all liens created by contract between creditors on the one side and debtors on the other, by which property is set apart as security for the payment of debt, or hypothecated for the performance of an act, and providing the remedy for the enforcement of the right, or lien of the one party as against the other.

6 Idaho at 12, 51 P. at 999. A "transfer in trust," which was exempt from Idaho Code section 45-108 by way of the definition in Idaho Code section 45-101, referred to instruments that would "create trusts, but at the same time absolutely convey the title from the grantor, thus doing something more than the mere hypothecation of property for the payment of debt." *Id.* at 13, 51 P. at 999. "A deed of trust, conveying absolutely and irrevocably the title of the grantor, is exempted from the operation of [Idaho Code section 45-101 and 45-108]." *Id.* After reviewing the language in the deed of trust in question in *Brown*, this Court determined that the deed of trust "hypothecated the real estate in controversy, as security for the payment, to the bank, of the debt therein named." *Id.* The deed of trust was "in effect, a mortgage." *Id.* As a mortgage, the deed of trust was not a "transfer in trust." *Id.* Therefore, the deed of trust in question was not exempt from Idaho Code sections 45-101 and 45-108. *Id.* Based on *Brown*, it would appear that deeds of trust that absolutely convey title are exempt under Idaho Code sections 45-101 and 45-108, but deeds of trust that are essentially mortgages are not exempt under these statutes.

With the Idaho Trust Deeds Act in 1957, however, the legislature "effectively overruled" *Brown. Frazier v. Neilsen & Co.*, 115 Idaho 739, 741, 769 P.2d 1111, 1113 (1989). The Idaho Trust Deeds Act indicates that mortgages and deeds of trust should be treated as separate instruments. The Court explained in *Frazier*:

> Because the legislature has created a separate scheme for deeds of trust, the rationale for *Brown v. Bryan*, that mortgages and deeds of trust are functional equivalents, is undercut. The legislature obviously intended separate treatment; therefore, they are not functionally the same.

> A mortgage and a deed of trust are also separately defined. *Compare* I.C. § 45-901 *with* I.C. § 45-1502(3). Further, in I.C. § 45-1502(5), the use of deeds of trust is limited *inter alia* to real property not exceeding twenty acres. If the legislature intended deeds of trust to operate as mortgages under I.C. §§ 6-101 *et seq.*, then the bulk of the Trust Deeds Act, and in particular I.C. §§ 45-1502(3) and (5), are mere verbiage without meaning.

*Id.* at 741, 769 P.2d at 1113. Accordingly, the rationale in *Brown* that certain deeds of trusts are essentially mortgages and must be treated as such is no longer accurate and *Brown* cannot serve as support for Witherspoon's position that Idaho Code section 45-108 includes certain deeds of trust.

14

and E. The execution of a Release of the Lien would still have been necessary for Witherspoon to have had the first priority.

   3.  *Liberty's New Deed of Trust could not have provided the basis for the foreclosure sale.*

It is undisputed that Liberty's New Deed of Trust was never recorded. The Idaho Code is clear that a trustee can only foreclose by advertisement and sale where "[t]he trust deed. . . [is] recorded in mortgage records in the counties in which the property described in the deed is situated." I.C. § 45-1505. Therefore, the district court's reasoning undercuts its conclusion. If the Eighth LMA in and of itself released Blocks A, D, and E from Liberty's Original Deed of Trust, and Liberty's New Deed of Trust (which was secured by Blocks A, D, and E) was never recorded, then the trustee would not have a recorded deed of trust as to Blocks A, D, and E which could provide the basis to foreclose by advertisement and sale. The sale itself would thereby have been improper, and the district court's conclusion that Liberty legally purchased Blocks A, D, and E would still have been error.

## C.     The Court will not address whether Liberty's non-judicial foreclosure is void for failing to comply with Idaho law.

In its trial brief, Witherspoon argued that Liberty's non-judicial foreclosure was void for failing to give notice of default under the terms of the Eighth LMA. The district court did not explicitly rule on the validity of the foreclosure and trustee's sale. Nor did the district court grant declaratory relief to Witherspoon to re-notice the sale with respect to Blocks A, D, and E.

It is not clear how the parties expect the Court to resolve this foreclosure issue without an adverse ruling from the district court. "Even though an issue was argued to the court, to preserve an issue for appeal there must be a ruling by the court." *Saint Alphonsus Diversified Care, Inc. v. MRI Assocs., LLP*, 148 Idaho 479, 491, 224 P.3d 1068, 1080 (2009). Here, neither party sought a ruling on the validity of the foreclosure sale. "This Court does not review an alleged error on appeal unless the record discloses an adverse ruling forming the basis for the assignment of error." *Id.* (quoting *Ada Cnty. Highway Dist. v. Total Success Invs., LLC*, 145 Idaho 360, 368–69, 179 P.3d 323, 331–32 (2008)). Accordingly, this Court declines to address this issue.

## D.     Witherspoon is not an intended beneficiary of the Eighth LMA and has no right to enforce that agreement.

"Idaho case law is clear that the party claiming to be a third-party beneficiary must show that the contract expressly indicates that it was made for his or her direct benefit." *De Groot v.*

15

*Standley Trenching, Inc.*, 157 Idaho 557, 562–63, 338 P.3d 536, 541–42 (2014). "The mere mention of a third party in a contract does not render that party a third-party beneficiary absent a showing that the contract was made for that party's direct benefit." *Id.* at 562, 338 P.3d at 541. Witherspoon points to the following language in the Eighth LMA to demonstrate that it was an intended beneficiary: "This Agreement shall be binding upon, and shall inure to the benefit of, the parties' respective heirs, representatives, successors and assigns." Witherspoon submits that it is a "representative" of The Point and a "'successor' or 'assign' to Liberty in that Witherspoon succeeded to a secured interest in the very property described in the Eighth LMA by virtue of its Deed of Trust." Witherspoon's arguments here stretch the meaning of third-party beneficiary beyond recognition. The language identified by Witherspoon does not indicate in any way that the Eighth LMA was made for the direct benefit of Witherspoon. Witherspoon's capacity as legal representative for The Point does not qualify it as an intended beneficiary. Its role as legal representative is wholly separate from its claim to a security interest in Post Falls Landing. Similarly, Witherspoon is not a successor to or assign of Liberty. Any interest Witherspoon had in the property is derived from its own deed of trust, not from Liberty's. Witherspoon thus has no grounds to claim that it is a third party beneficiary of the Eighth LMA.

**E.     The district court erred in its determination that the Marina was entirely personal property.**

The final issue in this case is the district court's determination that the Marina was personal property and not a fixture to the Post Falls Landing real property.

The district court found the following facts regarding the Marina. The Marina consisted of 142 boat slips, a floating convenience store, and fuel pumps. The Marina was contemplated as a feature of the Post Falls Landing development. The fuel tanks were located on adjacent real property, and the tanks service the pumps via submerged fuel lines. The power and water lines service the slips via lines connected to the adjacent real property. The Marina was connected to the upland property through one ramp connection and through gas, water, and electrical lines. As originally proposed, the Marina was to have five ramp connections to the upland property. The Marina was designed to "pull apart" and "unplug." The Marina was built for Post Falls Landing, but it was designed so it could be located anywhere. Green's intent was not for the Marina to be a permanent amenity of Post Falls Landing. The dock was designed to pull apart "in case the Department of Lands didn't issue a permit or pulled some of the stunts that Jim Brady pulled."

16

To determine whether an article is a fixture, three factors are considered: "(1) annexation to the realty, either actual or constructive; (2) adaptation and application to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) intention to make the article a permanent accession to the freehold." *Rowan v. Riley*, 139 Idaho 49, 55, 72 P.3d 889, 895 (2003) (quoting *Rayl v. Shull Enters., Inc.*, 108 Idaho 524, 527, 700 P.2d 567, 570 (1984)).

Based on these facts, the district court found that the adaptation and annexation prongs indicated that the Marina was a fixture. Specifically, the district court found that the annexation prong was satisfied because the Marina was connected to the real property through one ramp connection and gas, water, and electrical lines and the adaptation prong was satisfied because the Marina was useful to the adjunct real property "as a marina was contemplated as a part of the overall development." Recognizing the importance of the intent factor, however, the district court found that The Point did not "necessarily intend" to make the Marina a permanent fixture. "Essentially," the district court explained, "Mr. Green designed a dock which could be relocated and pulled apart because he did not trust the Department of Lands and its agent Jim Brady." The district court based its finding on Green's testimony that he intended to build a non-permanent Marina.

We hold that the district court erred by improperly focusing on the subjective evidence of Green's intent without adequately considering the objective circumstances.

Whether an article constitutes a fixture to real property is normally a mixed question of law and fact. *Steel Farms, Inc. v. Croft & Reed, Inc.*, 154 Idaho 259, 268, 297 P.3d 222, 231 (2011) (citing *Rayl*, 108 Idaho at 527, 700 P.2d at 570). "However, application of the three-part test becomes a pure question of law when only one reasonable conclusion may be drawn from the evidence." *Rayl*, 108 Idaho at 527, 700 P.2d at 570.

In *Rayl*, the Court explained the intent factor as follows:

> The intention sought is not the undisclosed purpose of the annexor, but rather the intention implied and manifested by his act. Thus, the intent should be determined from the surrounding circumstances at the time of installation, and not necessarily from testimony as to the subjective intent of the installer and his frame of mind at the time of installation. [T]he inquiry is not strictly as to the intention of the person himself who annexed the chattel to the freehold . . . . The inquiry is as to what intention must be imputed to him in the light of all the circumstances, when tested by the common understanding of those familiar with the subject.

17

108 Idaho at 528, 700 P.2d at 571 (alterations in original) (citations omitted) (internal quotation marks omitted). The Court of Appeals has listed nine factors useful in objectively determining intent:

> (1) the nature of the article; (2) the manner of annexation to the land; (3) the injury to the land, if any, by its removal; (4) the completeness with which the chattel is integrated with the use to which the land is being put; (5) the relation which the annexer has with the land such as licensee, tenant at will or for years or for life or fee owner [sic]; (6) the relation which the annexer has with the chattel such as owner, bailee or converter; (7) the local custom respecting treating such chattel as personal property or a fixture; (8) the time, place and degree of social, economic and cultural development, (e.g., a luxury in one generation is a necessity in another . . . ); and (9) all other relevant facts surrounding the annexation.

*Everitt v. Higgins*, 122 Idaho 708, 712, 838 P.2d 311, 315 (Ct. App. 1992) (omission in original) (quoting R. BOYER, SURVEY OF THE LAW OF PROPERTY 329 (3rd ed. 1981)). The evidence of intent relied upon by the district court—Green's statement that he did "not necessarily" intend the Marina to be a permanent amenity—was not objective. The district court should have focused on the objective circumstances in relation to each individual piece of the Marina.

Accordingly, we vacate the district court's judgment on this issue and remand for the district court to make a separate determinations for each Marina structure based on objective evidence of intent as to each.

### VI. CONCLUSION

We vacate the summary judgment ruling of the district court with regard to judicial estoppel, vacate the judgment of the district court with regard to Witherspoon's first priority security interest to Blocks A, D, and E in Post Falls Landing, and vacate the district court's judgment with regard to the Marina and remand for further proceedings on that issue. Costs to Liberty.

Justices EISMANN, BURDICK and HORTON, CONCUR.

J. JONES, Chief Justice, concurring in part and in the result.

I concur with the Court's analysis of the Marina issue in Part E of Section V, but depart from the Court's analysis in Parts A through D. With respect to Parts A−D, I concur in the result reached by the Court, which, as I understand it, would vacate and remand for an almost complete do-over. While I think the district court tried to do the right thing by quieting title in Blocks A,

D, and E in Liberty, subject to Witherspoon's first-recorded deed of trust, the route taken by the district court was legally flawed.

In order to understand how this case went off of the legal rails, it is necessary to briefly consider how the case proceeded. Liberty filed the action seeking to quiet title to the Marina. In its first amended answer, Witherspoon raised a number of affirmative defenses, including unclean hands[4] and that Liberty's claims were "barred" by defects in the foreclosure proceedings. Witherspoon also counterclaimed against Liberty, seeking declaratory relief and claiming entitlement to relief as a third-party beneficiary of the Eighth LMA. In its claim for declaratory relief, Witherspoon alleged that Liberty was estopped from denying the enforceability of the Eighth LMA, that the new deed of trust called for in the Eighth LMA superseded the original deed of trust, that Liberty improperly foreclosed under the original deed of trust, and that Witherspoon had not subordinated its prior deed of trust to the Eighth LMA and the new deed of trust called for therein. When Witherspoon moved for partial summary judgment declaring the Eighth LMA to be binding and enforceable, it reiterated these themes in its legal memorandum. While claiming estoppel, it did not identify a specific estoppel theory, nor did it specifically invoke its unclean hands theory.

The district court apparently chose to invoke judicial estoppel to hold that Liberty could not deny the enforceability of the Eighth LMA. This holding was in error and, as it turns out, superfluous because the district court determined, following trial, that the Eighth LMA was valid and binding between Liberty and The Point. However, premature invocation of judicial estoppel appears to have obscured or obviated the need to address the unclean hands defense and whether Liberty foreclosed against Blocks A, D and E under the wrong deed of trust.

The district court's invocation of judicial estoppel is perhaps understandable in light of the fact that Liberty had, indeed, signed the Eighth LMA, and had received the executed promissory note and deed of trust for Blocks A, D and E, but nevertheless chose to foreclose

---

[4] "The unclean hand doctrine (also known as the clean hands doctrine) 'stands for the proposition that a litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy in issue.'" *Kirkman v. Stoker*, 134 Idaho 541, 544, 6 P.3d 397, 400 (2000) (quoting *Gilbert v. Nampa Sch. Dist. No. 131*, 104 Idaho 137, 145, 657 P.2d 1, 9 (1983)). The present case is clearly a case in equity, both starting and ending as a proceeding to quiet title. *Anderson v. Whipple*, 71 Idaho 112, 121−22, 227 P.2d 351, 356 (1951), *overruled on other grounds* by *David Steed & Assoc., Inc. v. Young*, 115 Idaho 247, 766 P.2d 717 (1988).

under the original deed of trust. However, it would have been better to have denied Witherspoon's motion for partial summary judgment and let the matter fully play out at trial.

Because the judicial estoppel theory was directed specifically at the question of enforceability of the Eighth LMA and not at the issue of whether it or some other theory prevented Liberty from claiming priority over Witherspoon's previously-recorded deed of trust, the district court found another reason to grant priority to Witherspoon. That resulted in application of Idaho Code section 45-108, which, as the Court correctly determines, has no application here.

The foregoing recitation is certainly not intended to be a comprehensive analysis, as there are still a number of matters that will need to be addressed by the district court on remand. It is hoped that the following analysis of the issues raised in Parts A−D will be helpful in that respect.

With regard to Section V.A, I agree that the district court incorrectly ruled on summary judgment that Liberty was judicially estopped from denying the enforceability of the Eighth LMA. However, this error is immaterial in light of a subsequent factual determination made by the court in its order denying Liberty's motion to reconsider following trial. In that order, the district court, considering conflicting trial testimony, determined that the Eighth LMA was the binding agreement between Liberty and The Point. Liberty's President, while acknowledging having signed the Eighth LMA, denied having received the executed security documents—the new promissory note and new deed of trust pertaining to Blocks A, D and E. On the other hand, Harry Green, President of The Point, testified that he provided the notarized Eighth LMA and ancillary security agreements to Liberty. The district court determined that Mr. Green's testimony was more credible, that the Eighth LMA was the binding agreement between the parties and, somewhat by inference, that the foreclosure against Blocks A, D and E was improper under the original deed of trust.

Although not mentioned by the district court, the Eighth LMA, itself, sheds light on the issue. Green signed this document in Spokane on September 1, 2011, according to the notary public acknowledging his signature. Green testified that he provided it to Liberty, along with the acknowledged security agreements. Liberty's president signed the Eighth LMA in Texas on September 8, 2011, according to the notary public acknowledging the same. The agreement specifically says, "[c]ontemporaneously with the execution of [the Eighth LMA], [The Point] is executing construction and development loan documents evidenced by a note in the original

20

principal amount of $2,545,843.31 . . . secured by, among other things, a deed of trust encumbering [Blocks A, D and E]." Contemporaneous means "occurring . . . at the same time." Black's Law Dictionary (10th ed. 2014). Liberty, having acknowledged that the new note and new deed of trust were signed contemporaneously with the Eighth LMA and presumably available at the time it executed that document, cannot very well claim otherwise.

Whether Liberty is judicially estopped from contesting the enforceability of the Eighth LMA is beside the point. The district court subsequently ruled that the Eighth LMA was the binding agreement between the parties and Liberty did not appeal that determination.

With regard to Section V.B, I concur with the Court's conclusions that the Eighth LMA did not, by its terms, release Blocks A, D, and E from Liberty's original deed of trust and that Idaho Code section 45-108 does not apply to deeds of trust. Therefore, the Court correctly vacated the district court's holding quieting title to Blocks A, D and E in Liberty subject to Witherspoon's deed of trust.

I agree with the Court's finding that the Eighth LMA required Liberty to execute a Partial Release of Lien to release Blocks A, D, and E from Liberty's original, modified deed of trust and that "Liberty failed to fulfill its obligations in this regard." It is clear from the record that Liberty received the signed Eighth LMA, along with the new promissory note and new deed of trust, and that Liberty executed the Eighth LMA a week after The Point did so. Upon receipt of these documents, the ball was in Liberty's court. It was Liberty's contractual obligation to record the new deed of trust and file the Partial Release of Lien. The Eighth LMA does not specify a date for the performance of those acts, but in the context of the agreement it appears that it should have been accomplished immediately upon its receipt of the Eighth LMA and related security documents. In any event, Liberty was required to do so within a reasonable period of time. *VanderWal v. Albar, Inc.*, 154 Idaho 816, 822, 303 P.3d 175, 181 (2013). It did not and, indeed, has never done so.

However, just because the new deed of trust and Partial Release of Lien were not recorded does not necessarily mean that Liberty had a legal right to foreclose its original deed of trust, as modified, with respect to Blocks A, D, and E. The Eighth LMA specifically called for a new deed of trust against Blocks A, D, and E and for release of the original deed of trust against that same property. Because the new deed of trust was executed by The Point and delivered to Liberty, it became the operative security instrument between those two parties with respect to

Blocks A, D and E. A deed of trust must be recorded to provide notice to other parties, but it is effective between the parties themselves, even if not recorded. If the Eighth LMA and new deed of trust superseded the original deed of trust under which Liberty purportedly foreclosed on Blocks A, D and E, how could it use that deed of trust as the basis for the foreclosure? It would certainly seem that the superseding deed of trust, executed and delivered pursuant to the Eighth LMA, should have been the basis for the foreclosure. As the Court points out, in order to foreclose by advertisement and sale, the trust deed must be "recorded in mortgage records in the county in which the property described in the deed is situated." I.C. § 45-1505(1). This would obviously mean the current trust deed, rather than a superseded one. That did not occur here, as Witherspoon repeatedly argued to the district court before, during, and after trial.

Nevertheless, the fact remains that the district court erroneously relied upon Idaho Code section 45-108[5] in determining that Witherspoon's deed of trust had priority over Liberty's and, therefore, the Court correctly vacated that holding. This critical issue must be determined in further proceedings upon remand.

With regard to Parts C and D of Section V, there was no adverse ruling by the district court from which an appeal may be taken. Witherspoon certainly raised both issues—that Liberty's non-judicial foreclosure was void for having been conducted under a superseded deed of trust and that Witherspoon was a third-party beneficiary[6] of the Eighth LMA—but neither issue was addressed by the district court in any of its rulings. It is not for this Court to decide either issue. Rather, those issues must be determined in the first instance by the district court upon remand.

When the district court takes up this case on remand, it is my view that the issue of who has the priority claim to Blocks A, D, and E should take into account the following salient facts:

---

[5] Reading between the lines of the district court's decision, it appears that the determination of this issue was influenced by the court's judicial estoppel holding. While it may well be that judicial estoppel has application to the broader question of whether Liberty may be estopped from asserting priority over Witherspoon, that broader issue was not addressed by the district court.

[6] Witherspoon's third-party beneficiary argument does seem to be somewhat weak, but that is a matter for the district court to determine on remand. Of interest is the fact that Liberty is before the Court seeking relief as a third-party beneficiary of the subordination agreement between Witherspoon and The Point. Contrary to the district court's assumption that the subordination agreement was between Liberty and Witherspoon, the agreement was actually between Witherspoon and The Point. If the issue of judicial estoppel is raised again on remand, it does not appear that a contractual relationship is required for that theory. *A&J Construction Co., Inc. v. Wood*, 141 Idaho 682, 686, 116 P.3d 12, 16 (2005).

22

1. Witherspoon's deed of trust on The Point property was recorded on October 4, 2004, prior to any of the Liberty trust deeds. The Witherspoon deed of trust secured the payment of a promissory note in the original sum of $164,171.85, together with "all such further sums as may hereafter be loaned or advanced by [Witherspoon]."

2. On August 26, 2005, Liberty and The Point entered into their original loan agreement. The Point executed a deed of trust securing payment of a note in the amount of $3,934,390. Apparently at Liberty's request, Witherspoon entered into an agreement with The Point to subordinate the priority of its deed of trust to Liberty's deed of trust "and any renewals or extensions thereof."

3. The Point and Liberty entered into six modifications of the loan agreement and in each instance Liberty required Witherspoon to execute a subordination agreement with The Point.

4. Liberty and The Point entered to the Seventh LMA on September 1, 2010. However, the effective date of the agreement was April 30, 2010. As a condition of the agreement, Liberty required Witherspoon to enter into an additional subordination agreement. Unlike the previous subordination agreements, the August 10, 2010 subordination agreement did not extend to any renewals or extensions of the indebtedness secured by Liberty's deed of trust.

5. On September 1, 2011, The Point executed the Eighth LMA, which had an effective date of April 30, 2010, identical to the Seventh LMA. Liberty executed the Eighth LMA on September 8, 2011. The Eighth LMA recited that it represented "the final agreement between the parties herein."

6. Although Liberty apparently had in its possession the executed deed of trust against Blocks A, D and E called for pursuant to the Eighth LMA, it chose to foreclose on that property under the original deed of trust.

Although the parties can litigate as they choose on remand, it seems to me that this case boils down to whether Liberty prosecuted its foreclosure under a superseded deed of trust, whether the subordination agreement executed by Witherspoon in conjunction with the Seventh

23

LMA remained effective,[7] whether Liberty is precluded from claiming priority by virtue of equitable doctrines raised by Witherspoon, and the effect, if any, of the fact that both the Seventh LMA and Eighth LMA have the very same effective date.

---

[7] It seems to me that little consideration was given to the actual subordination agreement, as shown by the fact that Liberty was assumed to be a contracting party. A subordination agreement does not change the dates of recording of trust deeds but, rather, pertains to the priority of payment. "[T]he general thrust of a subordination agreement . . . is the subordination of the right to receive payment of certain indebtedness (the 'subordinated debt') to the prior payment of certain other indebtedness (the 'senior debt') of the same debtor." *Blickenstaff v. Clegg*, 140 Idaho 572, 581, 97 P.3d 439, 448 (2004). But for the subordination agreement, Witherspoon would have priority.